William Boyd TUCKER,
Petitioner-Appellant,

v.

Ralph KEMP, Warden,
Respondent-Appellee.

No. 83–8137.

United States Court of Appeals,
Eleventh Circuit.

May 31, 1985.

Opinion on Denial of Rehearing
July 23, 1985.

Robert B. Remar, Eric G. Kocher, Atlanta, Ga., for petitioner-appellant.

Mary Beth Westmoreland, Wm. B. Hill, Jr., Atlanta, Ga., for respondent-appellee.

Before GODBOLD, Chief Judge, RONEY, TJOFLAT, HILL, FAY, VANCE, KRAVITCH, JOHNSON, HENDERSON, HATCHETT, ANDERSON and CLARK, Circuit Judges.[*]

R. LANIER ANDERSON, III, Circuit Judge:

William Boyd Tucker was tried in the Superior Court of Muscogee County, Georgia, for the August 1977 murder of Kathleen Perry. He was convicted of murder, kidnapping with bodily injury, and robbery by intimidation. The jury sentenced Tucker to death for the murder and lesser terms for the other crimes. His convictions and sentences were affirmed by the Georgia Supreme Court and a petition for writ of certiorari to the United States Supreme Court was denied. *Tucker v. State*, 244 Ga. 721, 261 S.E.2d 635 (1979), *cert. denied*, 445 U.S. 972, 100 S.Ct. 1666, 64 L.Ed.2d 250 (1980).

Tucker sought habeas corpus relief in the state courts but was unsuccessful. The state supreme court refused to hear an appeal and the United States Supreme Court denied Tucker's second petition for writ of certiorari. *Tucker v. Zant*, 454 U.S. 1022, 102 S.Ct. 555, 70 L.Ed.2d 417 (1982). Tucker then filed the instant habeas corpus petition in the federal district court. Relief was denied. On appeal, a panel of this court considered six constitutional claims and granted relief on the ground that improper prosecutorial argument had rendered Tucker's sentencing hearing "fundamentally unfair." *See Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974). The Court rejected all other asserted grounds for relief. *Tucker v. Zant*, 724 F.2d 882 (11th Cir.1984).[1] We voted to reconsider en banc the prosecutorial argu-

ment at sentencing issue, thereby vacating the panel opinion. 724 F.2d 898 (11th Cir. 1984). We now affirm the district court's denial of relief on the prosecutorial argument claim and reinstate the panel opinion in all other respects.

Part I of this opinion outlines the relevant facts of Tucker's case. Part II discusses the standard for reviewing claims of improper prosecutorial argument. *See Brooks v. Kemp*, 762 F.2d 1383 (11th Cir. 1985) (en banc). Part III considers the alleged improprieties in this case. Finally, Part IV determines whether the improper arguments warrant granting Tucker a new sentencing hearing.

## I. FACTS

Kathleen Perry was working alone as a clerk in a Majik Market in Columbus, Georgia, on the night of August 20, 1977. Witnesses placed Tucker in the store shortly before midnight. Shortly after midnight, two customers entered the store, noted that no employee was on the premises, and called the police.

At approximately 1:00 a.m. on August 21, three Columbus residents driving in a pick-up truck passed a red Volkswagen parked with its lights on. They looked inside the car, saw Tucker at the wheel, and noticed a shoe on the pavement. After driving approximately one-fourth of a mile, they turned to go back and the Volkswagen passed them. Returning to the spot where the car had been parked, they found the shoe, a Majik Market vest, a bra, and the body of Kathleen Perry. She had been stabbed to death; the medical evidence suggested that she bled to death within 4 to 6 minutes. The police were notified.

While the police were on the scene with the witnesses who found the body, a red

---

[*] All of the Judges of the Court join in Judge Anderson's opinion for the Court, with the exception of Judges Kravitch, Johnson and Clark. Judge Johnson has filed an opinion specially concurring on the prosecutorial argument issue because he is bound by this court's opinion in *Brooks v. Kemp*, 762 F.2d 1383 (11th Cir.1985) (en banc). Judge Clark, joined by Judge Kravitch, has filed an opinion dissenting on the prosecutorial argument issue.

[1.] The other constitutional claims were (1) that an instruction in the sentencing phase was infirm, (2) that counsel was ineffective at trial and on appeal, (3) that the Georgia Supreme Court failed to review properly Tucker's sentence, (4) that evidence was insufficient to prove a necessary statutory aggravating circumstance, and (5) that the district court improperly denied an evidentiary hearing.

Volkswagen approached. The witnesses identified the driver as the man they had seen earlier. William Boyd Tucker was arrested and gave a confession in which he admitted to robbing and kidnapping Perry and forcing her to commit oral sex upon him. He claimed not to remember anything else except that there had been a knife and much blood.

Given this evidence, the jury found Tucker guilty of murder, robbery, and kidnapping. Although the indictment also charged Tucker with aggravated sodomy, a directed verdict was entered on the charge because Georgia law disallows convictions based solely on uncorroborated confessions. Ga.Code Ann. § 24–3–53 (1982).

Because the district attorney's office had chosen to seek the death penalty in this case, the sentencing hearing required by the Georgia capital punishment statute commenced. Ga.Code Ann. § 17–10–2(c) (1982). The state introduced no new evidence relative to punishment. Various defense witnesses testified to Tucker's previously peaceful nature and the stress placed upon him by the death of his father three months before the crime. Tucker and his mother explained that his use of drugs and marijuana had become a serious problem after his father's death. Tucker explained that he had been drinking and smoking heavily the day of the crime and continued to claim a lack of memory about the actual

killing. He also expressed remorse for the crime and hoped that he could rehabilitate himself while in prison. Tucker had never been in trouble with the law before.

After this evidence was introduced, closing arguments were delivered for the state and the defendant.[2] The jurors were then instructed and began their sentencing deliberation. After a short time, the jury returned a verdict of death.[3]

## II. STANDARD OF REVIEW

■ In *Brooks v. Kemp,* 762 F.2d 1383 (11th Cir.1985) (en banc), this court considered the standard for federal habeas corpus review of alleged errors in prosecutorial closing arguments. The standard, first explicitly discussed in *Donnelly v. De-Christoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974), is not whether the complained-of comments are egregious or "universally condemned," but whether they rendered the defendant's trial "fundamentally unfair." 416 U.S. at 642, 94 S.Ct. at 1871. To make that determination vis a vis argument in a capital sentencing hearing, a reviewing court should ask whether there is a reasonable probability that, in the absence of the offending remarks, the sentencing outcome would have been different. *Brooks v. Kemp,* 762 F.2d at 1402; *see Strickland v. Washington,* — U.S. —, —, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674, 698 (1974).[4] A "reasonable probabili-

---

**2.** The prosecutor, Gray Conger, delivered an argument which takes up 17 pages of the trial transcript. Most of the argument focused on valid sentencing concerns; we will consider the allegedly improper arguments in Part III of this opinion.

**3.** Under Georgia law, the death penalty cannot be imposed for a capital crime unless the sentencing jury finds the existence of at least one statutory aggravating circumstance. Following such a finding, the jury has complete discretion to choose between death or life imprisonment for the defendant. *Zant v. Stephens,* 250 Ga. 97, 297 S.E.2d 1 (1982). In this case, the jury found as an aggravating circumstance that the murder was committed during the commission of another capital felony (kidnapping with bodily injury). It then was authorized to exercise its broad sentencing discretion and choose death as the penalty.

**4.** Tucker argues that the appropriate standard of review should consider not only the "fundamental fairness" implicit in the Due Process Clause of the Fourteenth Amendment, but also the heightened reliability required in capital sentencing by the Eighth Amendment. We believe that the "reasonable probability" test adopted from *Strickland v. Washington,* — U.S. —, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), can take into account the special nature of a capital sentencing proceeding. *See* — U.S. at —, 104 S.Ct. at 2073–74, 80 L.Ed.2d at 704–06 (Brennan, J., partially concurring). Justice O'Connor's majority opinion defined reasonable probability as a "probability sufficient to undermine confidence in the outcome." — U.S. at —, 104 S.Ct. at 2068, 80 L.Ed.2d at 698. Such a formulation does capture the Eighth Amendment's requirement that capital sentencing be reliable. Even if improper arguments are made by a prosecutor, the sentencing should not be disturbed if a reviewing court is confident that the

ty" is a probability sufficient to undermine confidence in the outcome. *Id.* at ——, 104 S.Ct. at 2068, 80 L.Ed.2d at 698.

Our review is obviously only concerned with the possible effect of improper arguments. We must therefore examine the closing argument in this case and isolate sections which were impermissible. We then can determine whether there is a reasonable probability that they changed the outcome of Tucker's sentencing hearing.

### III. PROPRIETY OF PROSECUTORIAL ARGUMENT

 Tucker challenges various arguments made by prosecutor Gray Conger in his closing argument at the sentencing phase.[5] A Georgia prosecutor may argue subjects relevant to the capital sentencing jury's decision. As a general matter, proper areas of argument include the facts of the crime, the individual characteristics of the defendant (including future dangerousness and rehabilitative prospect), and the valid penological justifications for the death penalty (retribution, incapacitation, and general deterrence). *Brooks v. Kemp,* 762 F.2d at 1406–1408. We will now examine the arguments complained of by Tucker to see if they exceeded those legitimate sentencing considerations.

1. Conger began his closing argument on the following note:

> I've been here a number of years in the District Attorney's Office and I've tried a number of cases, many cases as a matter of fact, and the death penalty is seldom requested in Columbus, it's very infrequently requested. And since I've been here, it's been requested as a matter of fact, something less than a dozen times.

outcome rested on valid sentencing considerations.

**5.** Tucker's counsel entered no objection during Conger's closing argument. Even though conventional professional courtesy may militate against objection during closing argument to the jury, the interest of the client may require it. The lack of a defense objection can be a factor in the review of a prosecutor's closing argument. *Brooks v. Kemp,* 762 F.2d at 1397 n. 19. Because the arguments themselves did not rise

It's not very often that we come in here and ask you to bring in a verdict of a death sentence on an individual.

Tucker claims that this argument improperly put the prosecutor's "expertise" before the jury as a reason for imposing the death penalty.

 We have held such arguments to be improper. *Brooks v. Kemp,* 762 F.2d at 1410. This discussion of the prosecutor's infrequency of seeking death was not supported by any evidence before the jury. It is wrong for the prosecutor to tell the jury that, out of all possible cases, he has chosen a particular case as one of the very worst. While facts of the crime can be stressed to show the seriousness of the case,[6] the prosecutor's careful decision that this case is special is irrelevant and is potentially prejudicial. Such comments, made by an experienced prosecutor, may alter the jury's exercise of complete discretion by suggesting that a more authoritative source has already decided the appropriate punishment. We will consider the impact of the statement in Part IV of the opinion.

2. Tucker next complains of various instances in which Conger asserted his personal opinion on matters before the jury. Conger asserted that Tucker could never be rehabilitated, arguing "I'd move to Russia before I'd live next door to this man." He explained how he would feel if Tucker was executed:

> [I]f he is executed, and if you bring in a verdict of guilty, I'll sleep just as good, or I'll sleep better knowing that one of them won't be on the street. Knowing that one of them will be gone. It's not all of them, but it's better than none.

to the level of a constitutional violation, *see infra* Part IV, we do not give independent consideration to the failure to object.

**6.** The prosecutor, for example, discussed why this particular case compelled death and focused on the overwhelming evidence of guilt. Given that the jury had already litigated Tucker's guilt, comments about the strength of the evidence were acceptable at the sentencing phase. *See Brooks v. Kemp,* 762 F.2d at 1402 n. 26.

Conger also gave this long statement about the deterrent value of the death penalty:

Well, Mr. Cain is probably going to get up here and tell you that he doesn't believe or the evidence is that punishment, or capital punishment, does not deter others from similar criminal activity. Well, to me ladies and gentlemen, I don't believe it. I don't believe that. You can count me as one of those people who believes that a person receiving a death sentence has got to have some effect on somebody. And ladies and gentlemen, when an execution occurs, whenever an execution occurs, it has got to have some effect on somebody who is planning some criminal activity somewhere. You can't tell me that if this man is executed some potential killer somewhere, maybe not in Columbus, maybe somewhere else, but it doesn't matter because it'll be somebody's daughter that's saved. You can't tell me that somebody ain't going to hear about that thing over there being punished, being executed, and is not going to say I'm not going to take the chance because the death sentence is enforced and they execute people for doing this kind of thing. There is no way it's not a deterrent.

■ An attorney's personal opinions are irrelevant to the task of a sentencing jury. *Brooks v. Kemp,* 762 F.2d at 1408; *United States v. Morris,* 568 F.2d 396, 401 (5th Cir.1978);[7] *see also* ABA Standards for Criminal Justice 3–5.8(b) ("It is unprofessional conduct for the prosecutor to express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant"). Conger's ability to sleep well, or his disingenuous claim that he'd "move to Russia" should not have been put before the jury. The comments will be further considered in Part IV.[8]

3. Tucker complains that Conger's remarks attempted to dilute the jury's sense of responsibility for a verdict of death. He focuses on the following argument:

[The defense attorney will] mention that, well, can you sleep well if this man is executed? Won't it bother you if you ever read about it or hear about it whenever it happens? But I for one want to tell you that you are not the ones who did it if he is executed. It does not rest on your shoulders, ladies and gentlemen. Policemen did their duty and they went out and made the case. The grand jury down there did its duty and it indicted him and charged him with these horrible offenses. The district attorney's office prosecuted the case, located the witnesses, and brought them in. The judge, the court came in and presided at the trial. And ladies and gentlemen, you are the last link in this thing, and if this man suffers the death penalty it's no more up to you than it is to anybody else, the grand jury or the police, or the district attorney's office. All of us are coming in and doing our duty.

■ Arguments that trivialize the task of a capital sentencing jury are improper. *McGautha v. California,* 402 U.S. 183, 208, 91 S.Ct. 1454, 1467, 28 L.Ed.2d 711 (1971) (it is essential that jurors recognize "the truly awesome responsibility of decreeing death for a fellow human [so that they] will act with due regard for the consequences of their decision"); *Fleming v. State,* 240 Ga. 142, 240 S.E.2d 37 (1977) (improper to argue to capital sentencing jury that appellate court will correct any errors); *see also Brooks v. Kemp,* 762 F.2d at 1411. This argument, by suggesting that the jury is only the last link in a long decision, does have the effect of trivializing its impor-

---

7. In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *Id.* at 1209.

8. The discussion about deterrence, while it improperly used the personal pronoun "I", was not an improper argument. The sentencing jury is entitled to consider deterrence, a valid capital sentencing objective. *Brooks v. Kemp,* 762 F.2d at 1406–1408. It is not entitled, however, to con-

tance. It was therefore improper and it will be considered in Part IV.[9]

■ 4. Conger argued that Tucker would not be rehabilitated and opined that society could not take a chance on him. Tucker claims that this kind of argument was overly emotional and thus barred by the rationale of *Hance v. Zant*, 696 F.2d 940 (11th Cir.), *cert. denied*, 463 U.S. 1210, 103 S.Ct. 3544, 77 L.Ed.2d 1393 (1983).

■ In *Brooks v. Kemp*, we considered and limited the language from *Hance* that dramatic appeals "to gut emotion [have] no place in the courtroom, especially in a case involving the penalty of death." 762 F.2d at 1404–1405, citing *Hance v. Zant*, 696 F.2d at 952–53. Our main concern is not with the emotional tenor of an argument, but with the propriety of its content. It is proper for a prosecutor to argue about the future dangerousness of a defendant. *Brooks v. Kemp*, 762 F.2d at 1406. The general assertions made by Conger about Tucker's danger to society did not exceed those proper bounds.

■ 5. Conger made an argument about the safety of prisoners and prison guards if Tucker were to receive a life sentence:

> [I]f he goes to the penitentiary with his propensity to do what he's done, others will be placed in jeopardy, because he'll be in there with other young prisoners. He'll be in with people who might be in there for car stealing, or marijuana or something, lesser offenses like that, he'll be mixed in there with young kids and they'll be exposed to him, they'll get his influence. We know about his perverted sexual habits. Ladies and gentlemen, we know about his inability to control his desire to kill. Other prisoners will be in there and they will be subjected to him. Do we want to put young people in his presence as it could be done in Reidsville

or wherever he goes to the penitentiary? He could kill them. I submit to you, ladies and gentlemen, that we can't afford to have this man in our society.

> Now, what about the guards who would be guarding him down there? The guards would be, of course, exposed to him.

This argument was an appropriate means of pointing out the possibility of Tucker's future dangerousness and did not call for a speculative inquiry into prison conditions. *See Brooks v. Kemp*, 762 F.2d at 1411; *see also California v. Ramos*, 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983).

■ 6. Conger referred to the vast expense of taxpayer's dollars that would be needed if Tucker were to receive life imprisonment. The remark was unsupported in evidence and completely alien to any valid sentencing consideration. *Brooks v. Kemp*, 762 F.2d at 1411. It will be examined further in Part IV.

■ 7. Conger mentioned Tucker's "lust," "perverted sexual desires," and "perverted sexual habits." These were references to Tucker's confession that he had forced the victim to commit oral sex. Although Tucker was indicted on an aggravated sodomy charge, a directed verdict was entered on that count. Tucker claims that these comments were improper references to facts not in evidence.

Because the confession was never stricken from the jury's consideration, the admission of sexual assault was in evidence. The question here is whether, following a directed verdict, evidence on the sodomy charge could still be mentioned at sentencing. We believe that the argument was proper.

■ The information relative to a sentencing decision is very broad. *United*

---

sider the prosecutor's own feeling of safety or satisfaction about a verdict.

**9.** The argument in this case is similar to one ruled proper in *Brooks v. Kemp*, 762 F.2d at 1395, 1411. The argument in *Brooks*, however, was explicitly focused on the claim that Brooks was himself responsible for his own punish-

ment. The remarks made could not be clearly interpreted to mean that, because of activities of police, judge and prosecutor, the jury's task was made relatively less important. Here, however, Conger's discussion of the jury's position as only one link in the chain was not mitigated by a principal focus on the responsibility of the defendant.

*States v. Tucker,* 404 U.S. 443, 446, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972). Even though capital sentencing is more formal than non-capital sentencing, restrictions which would limit consideration of evidence at trial are not always applied to capital sentencing. *Green v. Georgia,* 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979) (violates due process to apply state hearsay rule so as to exclude testimony offered in mitigation at capital sentencing). The breadth of sentencing information insures that the decision will be appropriately individualized.

One class of information which is particularly relevant to the sentencing decision is the defendant's previous criminal activity.[10] In addition to previous convictions, it is acceptable to consider evidence of crimes for which a defendant has been indicted but not convicted. *United States v. Martinez,* 584 F.2d 749, 750 (5th Cir.1978). Activities for which there has been no charge filed can be considered as well. *Horowitz v. Henderson,* 514 F.2d 740 (5th Cir.1975). *See generally* Campbell, *The Law of Sentencing,* § 90 (1978). In general, the relevant inquiry for information at sentencing is whether it is reliable. *Zant v. Stephens,* 462 U.S. 862, 863, 103 S.Ct. 2733, 2734, 77 L.Ed.2d 235, 236 (1983).

In this case, Tucker's confession contained an admission of sexual assault. Although a directed verdict was entered because of the lack of corroborating evidence, the admission was still properly before the jury. Conger's remarks were reasonable inferences from the evidence and relevant to the question of sentence.

In *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), the Supreme Court held that the constitutional protection against double jeopardy forbids the re-litigation in any future criminal trial

of an issue necessarily resolved by an acquittal in a prior criminal case. While the rule in *Ashe* has not yet been extended to bar evidence underlying an acquittal from use in sentencing, we recognize that *capital* sentencing is a more formal, trial-like proceeding to which many constitutional protections are applicable. *See, e.g., Bullington v. Missouri,* 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981) (because capital sentencing is formal in nature, constitutional protection against double jeopardy applies). Thus, while not deciding the issue, we note that *Ashe* may very probably be interpreted to block re-litigation of a factual issue at the sentencing phase of a capital trial following an acquittal on the same evidence at the guilt phase.[11] Assuming arguendo such an interpretation, this principle would not prohibit the use of Tucker's confession following the directed verdict in this case. Unlike a general jury verdict of acquittal on the sodomy count, which would probably be read as conclusive as to Tucker's non-participation, the directed verdict by the trial judge here was on the technical statutory ground that corroborating evidence was not introduced. *See* Ga.Code Ann. § 24–3–53 (1982). Thus, whether or not Tucker forced Kathleen Perry to engage in oral sex was not conclusively litigated at the guilt stage of his trial. As such, the rationale of *Ashe* would not mandate exclusion of the evidence at sentencing.

Conger's reference to the evidence of sexual assault was not improper.

## IV. WAS TUCKER'S SENTENCING HEARING FUNDAMENTALLY UNFAIR?

Four of the arguments made by Conger were improper—the discussion of the prosecutor's policy of infrequently

---

**10.** The bifurcated procedure used in capital cases was created, in part, so that criminal activity could be fully explored with regard to sentencing without affecting the jury's adjudication of guilt. *Gregg v. Georgia,* 428 U.S. 153, 190–91, 96 S.Ct. 2909, 2933, 49 L.Ed.2d 859 (1976).

**11.** For cases applying the *Ashe* principle to bar re-litigation of facts underlying an acquittal in a subsequent prosecution, see *United States v. Whitaker,* 702 F.2d 901 (11th Cir.1983); *United States v. Henry,* 661 F.2d 894 (5th Cir. Unit B 1981), *cert. denied,* 455 U.S. 992, 102 S.Ct. 1619, 71 L.Ed.2d 853 (1982); *Wingate v. Wainwright,* 464 F.2d 209 (5th Cir.1972).

seeking the death penalty (the "prosecutorial expertise" argument), the use of personal opinions in discussing Tucker's chance for rehabilitation, the suggestion that the jury was but one link in the decision (the "jury dilution" argument), and the reference to the burden on taxpayers which would flow from a life sentence. Because the evidence of the statutory aggravating circumstance was amply supported in this case,[12] we do not believe that the improper arguments affected that threshold finding. Given the existence of an aggravating circumstance, Tucker was rendered eligible for the death penalty under Georgia law. We must, however, determine whether there was a reasonable probability that the improper arguments changed the jury's exercise of discretion in choosing between life imprisonment and death. *See Brooks v. Kemp*, 762 F.2d at 1408 (Georgia sentencing jury has two tasks; prosecutorial argument affecting either task may warrant relief).

The principal error was Conger's prosecutorial expertise argument. Such argument suggests that the prosecutor's office has already made a careful decision that the defendant deserves death. That authoritative suggestion improperly invades the jury's complete discretion at the penalty phase.

While we recognize the potential for prejudice in this argument, there was some mitigation of its adverse impact. First, Conger's claim that this case was particularly serious was followed by an explanation of how the prosecutor arrived at that conclusion, which the jury was free to assess for itself. He discussed the horrible nature of the crime and the strength of the evidence. By explaining these justifications, he enabled the jury to consider whether the death penalty was indeed appropriate on the facts of the case. This mitigated somewhat the suggestion that the jury should simply trust Conger's judgment as to the seriousness of the case.

In addition, the defense counsel rebutted the notion of prosecutorial expertise in his closing argument. Responding to Conger's

claim that the case was especially bad, Tucker's attorney said:

> I have been at this bar as long as Mr. Conger, there has not been a request for a death case that I know of on any first-offender, 22 years old, in Muscogee County, Georgia.

Finally, the thrust of the entire sentencing phase emphasized the discretion of the jury in imposing punishment. Both closing arguments and the trial court instructions were clear that the jury had responsibility for the choice. This clarity of emphasis convinces us that the jurors understood both the importance of the decision and the fact that a prosecutor's choice to seek death did not limit their own discretion.

Conger's jury dilution argument was similar to the prosecutorial expertise comment, though less damaging. Although the argument could be read in isolation as a trivialization of the jury's role, the principal thrust of the sentencing proceeding emphasized the jury's importance. The jurors were repeatedly instructed by the court that the matter of punishment was "entirely within your discretion." This emphasis belies the alleged effect of the jury dilution argument and also renders the isolated personal comments by Conger relatively harmless.

Finally, Conger's reference to the "thousands and thousands and thousands of taxpayer's dollars" that would have to be spent imprisoning Tucker for life was clearly unprofessional and improper. However, because of its brevity, we do not believe that the remark had a great adverse impact.

In reviewing the cumulative effect of Conger's improper arguments, we do not find that they were strongly prejudicial. Although the prosecutorial expertise argument might under some circumstances mislead a sentencing jury, here it was mitigated in substantial measure, as were the personal opinion and jury dilution arguments, by the more pervasive thrust of the sentencing hearing. The taxpayer argument

12. *See supra* note 3.

was very brief. Together, these arguments did not have a severely prejudicial impact.

It is true that Tucker presented substantial evidence to mitigate his culpability for the crime. In addition to the fact that he was a first-offender, there was testimony about emotional trauma in his life at the time and a possible intoxication on the night in question. On the other hand, this was a very serious crime. We do not view the relatively small prejudicial impact of the improper arguments as undermining confidence in the sentencing verdict. We conclude that there is not a reasonable probability that, but for the few improper arguments, the sentence would have been different. We therefore affirm the district court's denial of relief on the prosecutorial argument issue.

AFFIRMED.

JOHNSON, Circuit Judge, specially concurring:

Although I acknowledge that I am bound by the en banc decision of this court in *Brooks v. Kemp*, 762 F.2d 1383 (11th Cir. 1985), I must express my disagreement with the conclusion of the majority that the prosecutorial argument in this case did not affect the reliability and fundamental fairness of the petitioner's sentencing proceeding.

## I. THE PROSECUTORIAL ARGUMENT

The majority held in *Brooks v. Kemp, supra*, that a prosecutorial argument, however improper, does not infringe a petitioner's right to a fair trial unless he can demonstrate a "reasonable probability" that those improprieties contained in the argument affected the outcome of the proceeding. 762 F.2d at 1401; *Strickland v. Washington*, — U.S. —, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). While I continue to question the applicability of the *Strickland v. Washington* standard to this context, *see Brooks v. Kemp*, 762 F.2d at 1426 n. 1 (Johnson, J., dissenting), it seems clear that such a "reasonable probability" exists in the instant case.

### A. Prosecutorial Expertise

The majority finds that the prosecutor's discussion of the infrequency with which attorneys in his office seek the death penalty was improper, because it led the jury to conclude that officials more experienced than they had already made the decision as to the appropriateness of capital punishment. Yet the majority concludes that this comment did not have a substantial prejudicial effect because the prosecutor referred to the factors that were behind the decision, permitting the jury to evaluate those factors for themselves, and because the arguments of both the prosecutor and the defense counsel emphasized that the jury was the body which had responsibility for making the sentencing decision.

This argument is no more acceptable in the instant context than it was when it was raised by the majority in *Brooks*. As in *Brooks*, the prosecutor presented his enumeration of the relevant factors in a way which emphasized not the factor to be considered, but the fact that a given element had already been evaluated by a knowledgeable authority and placed on the correct side of the ledger ("when we ask for a death sentence, as we do in this case, we consider a number of things ..."). This portion of the argument was thus an invitation to endorse the decision of the prosecutor's office rather than to reach an independent conclusion. Also, as in *Brooks*, the majority overestimates the ameliorative influence of later references to the jury's responsibility. The prosecutor's description of the activities and decisions of his colleagues brought to bear upon the jury the full weight of the prosecutorial office. *See Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). When this substantial weight is carefully and deliberately placed behind the demand for capital punishment, an abstract reference to the responsibility of the jury to reach its own conclusions is unlikely to have great corrective effect. This argument, which misused the authority of the prosecutor and undermined that sense of responsibility which is required for constitutionally sound sentencing decisions, im-

paired the fundamental fairness of the proceeding.

## B. Prosecutorial Opinions

The majority criticizes as irrelevant but refuses to find prejudicial a series of personal statements by the prosecutor concerning the petitioner, the ease with which he could see him sentenced to death and the deterrent effect of the death penalty. Once again, the majority fails to recognize that these statements place the impressive weight of the prosecutorial office behind positions which have no factual support in the record. As I noted in *Drake v. Kemp*, 762 F.2d 1449 (11th Cir.1985), the prosecutor's comments concerning deterrence, for example, may be based on purest speculation, yet the jury may assume that because of his position, they are based on hard experience that the jurors themselves have not acquired. Because of the unwarranted weight they exert on the minds of the jurors, such comments undermine the reliability of the proceedings.

## C. Dilution of Jury Responsibility

The majority also refuses to find prejudicial an argument that the jury was merely "the last link" in a chain of public actors, each of whom was merely "doing his duty" in bringing the petitioner one step closer to capital punishment. While the majority concedes that this argument tended to undermine the sense of responsibility constitutionally required in jurors considering capital sanctions, it finds the force of this argument to have been mitigated by other arguments citing the jury's responsibility. This conclusion crucially underestimates the effect of this argument on the minds of the jurors. Like the analogous argument in *Brooks*, it is specifically directed to the legitimate concern that jurors might feel uncomfortable imposing the death penalty; and it attempts to dispel that concern not simply by stressing the appropriateness of the penalty in the particular case, but by suggesting that the responsibility for imposing the death penalty would not rest with the jurors. This argument deftly removes from the capital sentencing calculus an element that the Constitution requires to be present. *See Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). In two respects, moreover, this argument is even more prejudicial than the one considered in *Brooks*. First, as the majority admits, it is not subject to the alternate interpretation that the prosecutor was simply trying to place responsibility for punishment on the wrongdoer himself. There is no mention in the argument of the petitioner or his responsibility for his punishment. Second, and perhaps more importantly, the prosecutor describes the decision to impose the capital penalty as a "duty" performed by jurors. The willful neglect of the discretionary nature of capital sentencing and the invocation of the obligations of citizenship implicit in this description were roundly criticized in both the majority and dissenting opinions in *Brooks*. 762 F.2d at 1412 (explaining harmful effect of "war on crime" argument), 1426 (Johnson, J., dissenting). In the face of such a concerted effort to relieve the burdens that attend the sentencing decision, subsequent reminders of the jury's responsibility could appear as no more than formalities, devoid of any substance relevant to the sentencing decision.

## D. Risks to Prisoners and Guards

The majority approves as proper and relevant to rehabilitative potential a lengthy discussion of the risk that the petitioner would pose to guards and prisoners in the institution in which he would be incarcerated. In so doing the majority neglects both the record, as it relates to the history of the petitioner, and the constitutional requirement of individuation in capital sentencing. *Lockett v. Ohio, supra; Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). Petitioner is a first-time offender, with no previous record of either sexual deviance or violent crime. To suggest that a prisoner with this record would be a particular threat to the safety or morals of those around him is to consider him not as an individual, but as a member of "a faceless, undifferentiated mass" of violent criminals, a move which the Constitution proscribes. This clear and forceful invitation to the jury to deny the petitioner the individuated consideration to which he was entitled undoubtedly affected the fundamental fairness of the proceeding.

In four critical ways the prosecutorial argument attacked the sense of responsibility and commitment to individualized decisionmaking that are essential to sound capital sentencing. I cannot endorse the opinion of the majority that this argument did not impair the fundamental fairness of the sentencing proceeding.

KRAVITCH, Circuit Judge.

I join Judge Clark's dissent.

CLARK, Circuit Judge, dissenting:

I dissent from the majority's conclusion that the argument in this case did not render the sentencing phase of William Boyd Tucker's trial fundamentally unfair. For the reasons stated in my special concurrence in *Brooks v. Kemp,* 762 F.2d 1383 (11th Cir.1985) (en banc), the majority's use of the *Strickland v. Washington* prejudice standard is a legal conclusion unsupported by precedent or constitutional analysis.

## I. THE PROPER INQUIRY

As stated in my special concurrence in *Brooks,* the proper test for determining whether the argument was constitutionally improper should be: (1) was the prosecutor's argument an unintentional breach of the proper boundaries, or designed to induce a decision that was not based on a rational assessment of the evidence; (2) did the argument or the type of argument tend to mislead or divert the jury; (3) was the remark(s) an isolated occurrence or were improper comments extensive throughout the argument; and (4) what was the nature of the decision to be made by the jury.[1] A more detailed examination of these factors can be found in my dissent in *Brooks v. Kemp.*

This test, in my view, strikes a constitutionally appropriate balance between the conflicting interests at stake. The defendant has a right to a rational decision made by the jury regardless of the strength of the evidence against him. The prosecution has an interest in securing convictions and death penalties, but not in appealing to jurors' fears and prejudices through inflammatory arguments in order to secure convictions or death sentences. Finally, the judicial system has an interest in making sure that convictions and sentences are based upon a rational assessment of the presented evidence and not through a process distorted by prosecutorial excess.

If the prosecutor makes improper arguments that tend to preclude a decision based upon a rational assessment of the evidence, then the defendant has suffered prejudice rendering the trial or sentencing hearing fundamentally unfair and making it impossible to determine if the jury's decision was based on the evidence and the law or the prejudice engendered by the prosecutor. The determination is made not by looking at isolated remarks, but by the argument as a whole in the context of the trial.

If it is determined that the proceeding was fundamentally unfair, then and only then comes the harmless error inquiry.[2] The use by the majority of the *Strickland* prejudice test merges the harmless error inquiry into the evaluation of whether the argument was constitutionally improper. Furthermore, this shifts the burden of proof to the victim of the alleged misconduct rather than the beneficiary of the error, the prosecution, contrary to the Supreme Court's decision in *Chapman v. California,* 386 U.S. 18, 23–24, 87 S.Ct. 824, 827–828, 17 L.Ed.2d 705 (1967). Finally, effect on the proceedings will miss the point in many cases. Using the new *Brooks* standard, if the prosecutor has a strong case, he is given a wider latitude to use improper arguments. As the likelihood that a person will be sentenced to death increases, the likelihood that an egregious argument will warrant reversal decreases. Such a test does not hold the prosecution to a high enough standard. An argument by a prosecutor should be determined to render a proceeding fundamentally unfair *vel non* without regard to the strength of the evidence against the accused in either the guilt/innocence phase or, as here, in the penalty phase of a capital trial.

## II. CLOSING ARGUMENT IN CONTEXT

Using the test set forth more fully in my special concurrence in *Brooks,* and outlined above, the argument in the penalty phase

---

**1.** This test is very similar to the one used by the panel in *Hance v. Zant,* 696 F.2d 940, 950 n. 7 (5th Cir.1980). Additionally, these factors are not necessarily a checklist but tools that a court should use in evaluating any particular argument.

**2.** An argument that has been determined to be fundamentally unfair in the penalty phase of a capital trial can seldom be harmless error. Due

to the subjective nature of the life/death decision and the fact that no matter how "aggravated" the crime may be, the jury always has the option of returning a sentence of life imprisonment. A reviewing court can seldom say that there is no possibility that an unfair closing argument influenced the death penalty that was imposed. If the argument exceeded constitutional limitations, then the writ in most cases must issue.

of William Boyd Tucker's trial, exceeded the limits of a constitutionally permissible penalty phase argument. At the outset it should be emphasized again that the argument challenged in this case occurred at the penalty phase of Tucker's trial. As the Supreme Court has noted, the consensus of their capital cases has been that "where discretion is afforded a sentencing body in a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited." *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 2741, 77 L.Ed.2d 235 (1983). The purpose of the penalty phase is to determine if death or life is the appropriate punishment in that case. *Lockett v. Ohio,* 438 U.S. 586, 601, 98 S.Ct. 2954, 2963, 57 L.Ed.2d 973 (1978). Improper arguments by the prosecutor at the penalty phase "interjects an irrelevant consideration into the fact finding process diverting the jury's attention from its proper focus, the characteristics of the individual and the offense." *Beck v. Alabama,* 447 U.S. 625, 644, 100 S.Ct. 2382, 2393, 65 L.Ed.2d 392 (1980). Such arguments increase the likelihood that a sentence of death will be arbitrary and capricious. The main thrust of the Supreme Court's death penalty decisions has focused upon the need to eliminate the risk of sentences imposed because of passion or prejudice. *Zant, supra,* 103 S.Ct. at 2742. Therefore, any claim of prosecutorial misconduct in the penalty phase of a capital trial must be examined with these considerations in mind.

The prosecutor in this case began his closing argument at the penalty phase with the following comment:

> I've been here a number of years in the district attorney's office and I've tried a number of cases, many cases as a matter of fact, and the death penalty is seldom requested in Columbus, it is very infrequently requested. And since I've been here, its been requested as a matter of fact, something less than a dozen times. It's not very often that we come in here and ask you to bring in a verdict of a death sentence on an individual. And there, of course, are a number of factors we look at when we consider bringing in a case and asking for a death sentence on it.

As the majority acknowledges, such comments are improper. Not only was this argument unsupported by any evidence in the record, it is wrong for a prosecutor to tell the jury he has chosen this case as one of the worst. Such remarks can only be intended and can only have the effect of informing the jury that the prosecution, experts in this field, have already made the decision that this is an appropriate case for the death penalty and that the jury should defer to that decision. Instead of urging the jury to consider all relevant facts before making its choice, he essentially informed them that the life/death decision had already been made. This argument could only have had the effect of reducing in the jurors' minds the burden imposed by Georgia law on them, i.e., that they and they alone could choose between a sentence of life imprisonment or the death penalty. These arguments were bolstered by the prosecutor's subsequent discussion of the factors that were considered in determining whether to seek the death penalty. The prosecutor went on to say: "Ladies and gentlemen, among some of these factors are the type of crime, the defendant, what is the crime he's done, and what his victim is like." [3]

The prosecutor then went on to talk about the victim in this case:

> And you know when you talk about our victim, let's talk about our victim in this case, a nineteen-year-old college girl, or nineteen-year-old married woman. We know that she was nineteen, she had a job, that she had most of her life to live ahead of her. She had recently married, she had a husband. She had a long way to go, she had perhaps sixty or seventy years left to live on a national average, if this defendant hadn't come along and cut off her life. If he hadn't come along and snuffed her out. If he hadn't come along and left an empty table, or empty chair in the Perry household. If he hadn't come along and left a empty chair on Christmas and holidays in the home of her parents, Mr. and Mrs. Knight, who are sitting over there on the front row. This man came along and destroyed a person who had a lot to live for, a person who hopefully had a long time left to live. He came along and caused a lot of heartbreaks, a lot of upsets, a lot more

---

**3.** The prosecutor came back to this theme of factors the prosecution considered in determining whether to impose the death penalty on several occasions.

than would be caused to him if this jury decided that his life should be taken. These statements urged the jury to vote for the death penalty not because of any factor relating to Mr. Tucker's character or the facts of the offense, but because the victim was a young newly married person who would be deeply missed by her family. These statements interjected arbitrary factors in the sentencing process that could only mislead or divert the jury from its proper focus.[4] The jury was explicitly told to compare the relative worth of the victim and the defendant to society, i.e., the victim was more worthy and she was dead. The less worthy defendant, therefore, should also die.

The prosecutor next made the following comment:

> He's got a judge up there on the bench weighing the law on this case. He's got a jury coming in and listening to the evidence. He had policemen who advised him of his rights when he was arrested. And, ladies and gentlemen, if he's executed it will be humane, it won't be with knife wounds in the back and knife wounds in the chest.
>
> Did anybody advise Kathleen Perry of her rights when she was killed? I submit to you, ladies and gentlemen, that comparing Kathleen Perry with the execution of this man, there is no comparison that can be made. This man has a judge, he's got a jury, he's had policemen to advise him of his rights, he's had a jury to pass on his guilt or innocence, and he's got a jury to pass on his fate. Kathleen Perry had none of this. She had no judge, she had no jury, she had nothing but his lust and desire for money, and desire to go out and snuff out the only victim to his crime. She had nothing that he is receiving here today, and he asked for his life to be spared.... Give him the same mercy he gave her. She didn't have a judge or a jury, or a grand jury to indict her. She won't have a trip to Reidsville and back. She won't have any of the other benefits that this man got.

These statements clearly urge the jury to punish Tucker for exercising his constitutional rights. Aside from the comparison

between the defendant and the victim noted above, there was also the unmistakable impression that the judicial system coddles criminals at the expense of law abiding citizens, by giving them procedural protections. These statements were not intended to have the jury make a decision based upon the this individual defendant and a rational assessment of the evidence.

The prosecutor then went on to discuss the possibility of Tucker being rehabilitated. Anticipating that the defense would argue the possibility of Tucker's rehabilitation the prosecutor made the following statement:

> He's going to say, well, this is a young man, he's only 21 or 22, he can be rehabilitated. Ladies and gentlemen, can you seriously believe that anybody who can do what he's done could ever be rehabilitated, that man rehabilitated. I'd move to Russia before I'd live next door to this man. Ladies and gentlemen, when you think about him think about rehabilitation, there is no way that this man can be rehabilitated, society can't afford to take the chance. He can't be in a position where he can do anymore damage.

The prosecutor then went on to say:

> And ladies and gentlemen, I'm going to ask you; I'm going to ask you, if you can't bring a death sentence in on man that's killed a woman in a ditch like this one did, what kind of case can you bring one in on? There is not going to be a case deserving of the death penalty more than this one.

This is only one of a number of statements in which the prosecutor gave his personal opinion. For example, in another part of the argument the prosecutor stated:

> Well, Mr. Cain is probably going to get up here and tell you that he doesn't believe or the evidence is that punishment or capital punishment does not deter others from similar criminal activity. Well, to me ladies and gentlemen, I don't believe it. I don't believe that. You can count me as one of those people who believes that a person receiving a death sentence has got to have some affect on somebody. And ladies and gentlemen, when an execution occurred, or whenever an execution occurs, it has got to have

---

4. *See, e.g., Vella v. Estelle*, 708 F.2d 954, 966 (5th Cir.1983), *cert. denied, sub nom. McKaskle v. Vella,* —— U.S. ——, 104 S.Ct. 736, 79 L.Ed.2d 195 (1984) (District court's denial of habeas corpus relief reversed), in which the court held

his statements relating to the character of the victim were irrelevant in consideration of the severity of the sentence and should not have been considered by the jury.

some affect on somebody who is planning some criminal activity somewhere. You can't tell me that if this man is executed some potential killer somewhere, maybe not in Columbus, maybe somewhere else, but it doesn't matter because it will be somebody's daughter that is saved. You can't tell me that somebody ain't going to hear about that thing over there being punished, being executed, and this is not going to say that I'm not going to take the chance because the death sentence is enforced and they execute people for doing this kind of thing. There is no way it is not a deterrent.

At another point he explained how he would feel if Tucker was executed. He said:

[I]f he is executed, and if you bring in a verdict of guilty, I'll sleep just as good, or I'll sleep better knowing that one of them won't be on the street. Knowing that one of them will be gone. It's not all of them, but it's better than none.

As the majority acknowledges, an attorney's personal opinion is irrelevant to the task of a sentencing jury in the capital trial. *See, e.g., United States v. Morris,* 568 F.2d 396, 401 (5th Cir.1978). Additionally, these comments suggest to the jury that there is reliable evidence demonstrating the correlation between capital punishment and reduction in violent crime. As the Supreme Court noted in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) this assertion cannot be verified emperically. 428 U.S. at 184–85, 96 S.Ct. at 2930. Additionally, this statement is not relevant to either the character of the defendant or the circumstances of the crime, the relevant factors in a capital sentencing proceeding. *See Lockett v. Ohio, supra.* The statements, therefore, diverted the jury from their proper focus.

Furthermore, the references to "one of them" could only have been intended to place the defendant within an undifferentiated mass of criminals. These statements suggest to the jury that the only way to protect themselves against crime generally is to bring back a sentence of death in this case. Such a factor is improper in a capital sentencing proceeding because it bears no relation to the individual defendant or the circumstances of his character or crime but rather places him within a larger group of people generally that society should rid itself of.

The significance of this statement is highlighted by another portion of the closing argument when the prosecutor stated:

You know, everybody at this day and age says to policemen and people in the district attorney's office, what can I do about all this crime such as this one here, what can I do? Well, one thing you can do, ladies and gentlemen, is when you come down and get on a jury and you find the defendant guilty, and you are convinced—that the defendant is guilty, and you are convinced that the case is one that deserves the death penalty, if you feel that way about it, one thing you can do is to do your duty if you feel that way and go ahead and give him the death penalty, because you've all said that you believe in the law. You've all said that you would follow the law. And ladies and gentlemen, I submit to you that we are not going to get a case more deserving of it than the case of William Boyd Tucker right over there. We are not going to have a case more deserving of the death penalty.

Again, such comments could only be intended to indicate to the jury that the only way they could protect themselves in the accelerating war on crime was to return a verdict of death in this case.

The prosecutor then went on to make remarks intended to dilute the jury's sense of responsibility for the death sentence. The prosecutor made the following comments:

But I for one want to tell you that you are not the ones who do it if he's executed. It does not rest on your shoulders, ladies and gentlemen. The policemen did their duty and they went out and made the case. The grand jury down there did it's duty and it indicted him and charged him with these horrible offenses. The district attorney's office prosecuted the case, located the witnesses and brought them in. The judge, the court came in and presided the trial. And ladies and gentlemen, you were the last link in this thing, if this man suffers the death penalty its no more up to you than it is to anybody else, the grand jury, or the police, or the district attorney's office. All of us are coming in and doing our duty.

In Georgia, the jury is the final sentencing authority in a capital case. Arguments which minimize this responsibility are inconsistent with the jury's role in a death

case and are therefore improper.[5] An argument such as the one in this case indicates to the jury that it is only one link in a long process and trivializes the "truly awe-. some responsibility of decreeing death for a fellow human." *McGautha v. California*, 402 U.S. 183, 208, 91 S.Ct. 1454, 1467, 28 L.Ed.2d 711 (1971).

> The prosecutor then went on to argue: Well, ladies and gentlemen, I submit to you that in some cases a life sentence is not enough. Because, if he goes to the penitentiary with his propensity to do what he has done, others will be placed in jeopardy, because he will be in there with other young prisoners. He'll be in with people who might be in there for car stealing, or marijuana or something, lesser offenses like that, he'll be mixed in there with young kids and they'll be exposed to him, they'll get his influence. We know about his perverted sexual habits. Ladies and gentlemen, we know about his inability to control his desire to kill. Other prisoners will be in there and they will be subjected to him. Do we want to put young people in his presence as it would be done in Reidsville or where ever he goes to the penitentiary? He could kill them. I submit to you, ladies and gentlemen, that we can't afford to have this man in our society.
>
> Now, what about the guards who would be guarding him down there? The guards would be, of course, exposed to him. The guards would be in his presence, the guards would have to be letting him, letting him out.

These comments served only to fuel the jury's speculation about irrelevant matters, i.e., prison security and administration. In that respect, they divert the jury from the real task before them. Such comments are not intended to help a jury make a rational assessment of the evidence. Rather, they are intended to influence the jury to make a decision based on fear; fear for the life of the guards or other prisoners.

The prosecutor then appealed to the jury as taxpayers to impose the death penalty in order to save the costs of feeding and housing Tucker:

> [They would be] feeding him, taking care of him, spending thousands and thousands and thousands of taxpayers dollars to support him for the rest of his life, however long that would be, he'll probably live sixty more years. I submit to you, ladies and gentlemen, that we can't afford to take a chance on it.

This argument was obviously improper. It provided a reason for the jury to impose the death penalty, i.e., to ease their tax burdens, that is completely irrelevant to the offense and the offender. Such arguments are indefensible.[6]

## III. CONCLUSION

Considering the argument as a whole, I must conclude that the prosecutor's argument at the sentencing phase of Tucker's trial rendered it fundamentally unfair. The improper comments that infiltrated the argument were clearly designed not to suggest that the jury make a rational assessment of the evidence but to influence it to render a decision based upon irrelevant and inflammatory suggestions. Furthermore, this is not a case where the prosecutor made one potentially inflammatory remark in the course of an otherwise proper argument. Rather, the prosecutor consistently injected misleading, improper, and inflammatory considerations into the life/death decision. Furthermore, the argument occurred at the penalty phase of the trial. The decision whether to or not to impose the death penalty, because of its focus on the character of the defendant and the subjective nature, is easier to distort through improper argument.

Finally, the constitutional error in this argument was not harmless. As the majority acknowledged there was substantial mitigating evidence. Tucker was a first offender. There was also testimony regarding serious emotional trauma in his life as well as the fact that he was intoxicated the night the crime took place. The

---

5. The Georgia Supreme Court has found similar arguments to be inconsistent with the jury's role. *See, e.g., Fleming v. State,* 240 Ga. 142, 240 S.E.2d 37 (1977) ("The jury is given the heavy burden of making the decision of whether the defendant will live or die. Comments about appellate safeguards on the death penalty suggest to the jury that they can pass their responsi-

bility for the death penalty on to this court." 240 Ga. at 146, 240 S.E.2d 37).

6. For examples of state court decisions condemning such arguments as indefensible, *see State v. Jordan,* 80 Ariz. 193, 294 P.2d 677 (1956); *Commonwealth v. Clark,* 322 Pa. 321, 185 A. 764 (1936).

cumulative weight of the numerous statements may well have tipped the scales in favor of the death penalty; certainly, it cannot be said: "there is no reasonable possibility that the [argument] might have contributed to the" result. *Chapman, supra*, 386 U.S. at 23, 87 S.Ct. at 827. Because of this possibility, William Boyd Tucker should be given a new sentencing hearing. Therefore, I dissent.

### ON PETITION FOR REHEARING

Before GODBOLD, Chief Judge, RONEY, TJOFLAT, HILL, FAY, VANCE, KRAVITCH, JOHNSON, HENDERSON, HATCHETT, ANDERSON and CLARK, Circuit Judges.

### PER CURIAM:

IT IS ORDERED that the petition for rehearing filed in the above entitled and numbered cause be and the same is hereby Denied.

CLARK, Circuit Judge, dissenting, with whom KRAVITCH and JOHNSON, Circuit Judges, join:

I dissent from the decision of the en banc court to deny rehearing in this case. The majority's use of the *Strickland v. Washington*, —— U.S. ——, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) prejudice test (which requires that the petitioner show that but for the improper argument the result of the proceeding would have been different) is in conflict with the recently decided Supreme Court case of *Caldwell v. Mississippi*, —— U.S. ——, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).

In *Caldwell*, the Supreme Court in evaluating the impact of an improper argument used by the prosecutor at the penalty phase of Caldwell's trial concluded:

> Because we cannot say that this effort [to minimize the jury's responsibility for determining the appropriateness of the death penalty] had *no effect on the sentencing decision*, that decision does not meet the standard of reliability that the Eighth Amendment requires.

—— U.S. at ——, 105 S.Ct. at 2646 (emphasis added).

The language used by the Supreme Court in *Caldwell* is, in essence, a paraphrase of the harmless error test used by the Court in numerous cases, most notably in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). As I maintained in my dissent in this case, the harmless error test is incompatible with the *Strickland v. Washington* prejudice test, which shifts the burden of proof to the petitioner to demonstrate that but for the improper argument the result of the proceeding would have been different.

Furthermore, the prosecutor in this case made statements at the penalty phase indicating that he seldom sought the death penalty and then gave the factors he considered in deciding whether to seek the death penalty in a particular case. The majority of the en banc court was troubled by this type of argument, i.e., the prosecutorial expertise argument. The root of the en banc majority's concern was identical to that espoused by the *Caldwell* majority, i.e., that the prosecutor's statement would lessen the jury's sense of responsibility for determining the appropriateness of the death penalty. Additionally, the majority recognized that the argument in this case had at least some prejudicial effect. The majority stated:

> We do not view the relatively small prejudicial impact of the improper arguments as undermining confidence in the sentencing verdict.

*William Boyd Tucker v. Kemp*, 762 F.2d 1480, 1489 (11th Cir.1985).

Therefore, the conclusion seems inescapable that the Court's decision in *Caldwell v. Mississippi, supra*, coupled with the majority's concession of at least some prejudice, requires reconsideration of our opinion in this case. I therefore dissent.