236

THE STATE OF OHIO, APPELLEE, *v.* GREER, APPELLANT.

[Cite as State *v.* Greer (1988), 39 Ohio St. 3d 236.]

(No. 87-684—Submitted May 31, 1988—Decided November 9, 1988.)

*Lynn C. Slaby,* prosecuting attorney, and *Marc R. Wolff,* for appellee.

*Baker, Chapman & Diefenbach, Peter T. Cahoon* and *Richard S. Kasay,* for appellant.

HOLMES, J.

## I

Appellant, by his twelfth proposition of law, challenges his conviction as being against the weight of the evidence and, because the verdict was based solely upon circumstantial evidence, that the evidence was not "consistent only with the theory of guilt and irreconcilable with any reasonable theory of innocence." *State* v. *Kulig* (1974), 37 Ohio St. 2d 157, 160, 66 O.O. 2d 351, 352, 309 N.E. 2d 897, 899. Admittedly, the evidence before the jury was circumstantial; however, a review of such evidence reveals that appellant was fully implicated as the sole person who could have committed this crime.

It was shown at trial that appellant had spoken to the victim several times on the day of the murder. Appellant knew that the victim would be home later that night and knew that the door could not be effectively locked due to a broken glass door pane. At trial, the coroner testified that there were

physical indicia placing the victim's time of death at approximately between 11:00 p.m. Sunday and 1:00 a.m. Monday. An acquaintance of the victim spoke with him by phone at 9:00 p.m. that evening but, when she called the victim again at 11:00 or 11:15 p.m., the phone went unanswered. Appellant admitted on the witness stand that he had indeed met with the victim at the victim's home on the night of the murder, but he then claimed that this was not later than 9:00 p.m. However, there was testimony from the victim's next-door neighbor that appellant had arrived at her home at approximately 10:00 p.m. that evening seeking the victim and had then left her home apparently intending to go to the victim's nearby residence.

The victim was killed as he sat in his kitchen. There were no signs of a struggle. However, blood spots were found by police investigators throughout the entire home. Moreover, the blood spots were incidental to a thorough search of the victim's home, *i.e.*, the drawers which had been pulled out had blood stains on them, and an overturned mattress had blood stains on it as did the linens, and other areas of the home. As will be more fully explained, the Bureau of Criminal Investigation's ("BCI's") analysis of these blood smears and accompanying fingerprints indicated that both the smears and fingerprints were those of appellant. Eventually, appellant confessed to having entered the premises on the morning following the murder and to then searching the premises for valuables. He explained that those valuables belonging to the victim which were discovered in appellant's home were stolen at that time. The blood spots he admitted came from cuts on his fingers which he claimed to have received on the prior evening while taking out his trash. All the above evidence must be viewed and interpreted in context with additional evidence which is more directly inculpatory.

Police discovered two shoeprints at the crime scene. These shoeprints were composed of the victim's blood which was found only around the victim. They were not smear prints but had resulted from someone first stepping in the victim's wet blood and then making the print. It was the coroner's testimony that all the victim's blood would have dried within five to six minutes of being exposed to the air. Thus, as the coroner testified, the print had to have been made within five to six minutes of the murder. Also, one of the shoeprints was obscured by and partly covered by the victim's fallen body. This shoeprint had to have been made between the time the victim first bled and the time his body came to rest on the floor. Both of the shoeprints were of a left tennis shoe bearing the distinctive pattern found only on Converse All-Star tennis shoes.

Appellant's Converse All-Star tennis shoes were confiscated from him at the police station. When appellant had been asked at his home to accompany police, it was observed that he put on the dark green Converse tennis shoes and this despite the fact that he was going outdoors during mid-winter when there was a relatively deep accumulation of snow on the ground. When questioned about this, appellant replied that the Converse All-Star tennis shoes were the only shoes he owned.

Having observed that the pattern of appellant's shoes looked similar to the shoeprint found at the crime scene, police sent the shoes to the BCI lab for comparative analysis. At trial, the BCI's expert testified that he had made such tests and that, although the bloody shoeprints did not have a sufficient amount of detail for him to posi-

tively identify them as belonging to appellant, nevertheless it was observed that appellant's shoe possessed the same characteristics as the shoeprint found at the crime scene. (This would include the same brand, pattern, shoe size and width.)

Appellant's jacket was also examined and found to contain bloodstains in both pockets. These bloodstains could only originally have been made by blood in a liquid form. The BCI's expert analyzed both the victim's and appellant's blood, these being the only two types found in the victim's home. The victim had ABO type "O" blood while appellant possesses ABO type "A" blood. Both blood samples contained the relatively uncommon enzyme esterase D ("ESD"). However, the victim's blood had enzyme ESD-type 1 while appellant's blood contains enzyme ESD-type 2. No ABO grouping could be deduced from the blood stains in the jacket pockets. However, the blood in both pockets contained the enzyme ESD. The blood in the righthand pocket contained enzyme ESD-type 2 and was easily explained as having come from appellant's cut fingers. The blood in the lefthand pocket was clearly enzyme ESD-type 1, the enzyme peculiar to the blood of the victim. It was inferable that appellant's left hand had come into contact with the victim's blood before such blood had dried. Since the evidence, with near certainty, placed appellant within inches of the victim at the very instant of time when the killing occurred, the prosecution needed to show little more. There was, however, considerable additional evidence. Appellant's right hand exhibited deep lacerations upon the two middle fingers at the time of his arrest, which cuts were photographed and examined. Appellant claimed that he had received such cuts while taking out the trash on the night of the murder, and that a piece of glass or some other sharp object had cut him as he pressed down on the trash bags.

Examination of the cut fingers indicated that the ring finger was cut nearly to the bone. The middle finger was also deeply cut but not nearly as deeply as the ring finger. Both of these cuts had sharp margins, which margins aligned as the hand was closed. The coroner testified that the twenty-two wounds upon the victim's body were made by a hiltless knife consistent with the kitchen knife found in the victim's sink. The coroner explained that a hiltless knife allows the hand to slide down over the blade. Thus, when, in the course of stabbing, the knife point struck resistance and the stabbing motion was made with considerable energy, the hand holding the knife would slide down over the handle and onto the knife blade. In such event, the finger closest to the blade would be cut more deeply, as was appellant's ring finger in the case here. It was the coroner's testimony that appellant's cuts were caused by gripping a knife blade and that such cuts were entirely consistent with the above motions. Moreover, he stated that such cuts would tend to bleed profusely for at least five to ten minutes even if immediately bandaged. This would provide an alternative explanation for the presence of appellant's blood throughout the victim's home.

Also, there was testimony that appellant had made a number of inculpatory statements prior to testifying in court. He originally denied seeing the victim at all on the day of the murder. It was later established that he had been with the victim several times that day, including the night of the murder. Initially, appellant denied searching the victim's home and admitted only that he went into the kitchen. Further, appellant first stated that he had cut

his fingers on the day previous to that of the murder. The jury might easily have concluded that such statements were made by appellant and that they were made for the express purpose of concealing his involvement in the crime at issue. It is readily apparent from all the foregoing that the jury's verdict was not against the manifest weight of the evidence.

Appellant submits in his fifth proposition of law that all statements made by him to the police, and testified to by them, should be suppressed as fruits of an illegal arrest. *Wong Sun* v. *United States* (1963), 371 U.S. 471. These statements constitute inconsistent attempts by appellant to extricate himself from blame for Roth's murder. Moreover, the prosecutor effectively utilized the statements to argue that appellant changed his admissions at each stage of the investigation to conform to newly presented evidence and, impliedly, testified to an entirely new version of his involvement because he had at that point heard all the state's evidence. At trial, appellant's motion for suppression was based on the alleged involuntariness of the statements but not upon whether the police had probable cause to arrest him. Accordingly, the probable cause issue is deemed to have been waived. See *infra* at proposition of law number four.

Nor will plain error lie for the trial court's refusal to suppress the statements at issue since police had ample cause to arrest appellant. Not only did appellant possess serious cuts on his fingers, but police also observed that he owned and wore only tennis shoes possessing the same tread as the print found next to and under the victim's body. Such observations provided a sufficient basis for probable cause to justify an arrest.

Furthermore, appellant voluntarily accompanied the police officers to the police station. He was given *Miranda* warnings twice before any questioning occurred. Eventually, he signed waiver forms attesting to the voluntariness of those statements elicited from him. Consequently, under either of the asserted theories, there was no error whatsoever in admitting the statements at issue.

Appellant asserts by his sixth proposition of law that those items discovered by police in his home ought to have been suppressed as evidence because the police search was warrantless and because the consent of the third party was invalid. The items seized included the victim's watch and various cloth articles found to contain blood stains, all of which were admitted against appellant at trial. The search itself occurred while appellant was at the police station. Police arrived at the home and asked to search the premises. Appellant's girlfriend and co-resident voluntarily permitted the search to occur. She signed a consent-to-search form, and apparently assisted police in the search.

It is accepted law that one with authority over premises may voluntarily permit a warrantless search by police. *Schneckloth* v. *Bustamonte* (1973), 412 U.S. 218. This is true even if the authority is shared with another and the complaining party was in police custody at the time. See *United States* v. *Matlock* (1974), 415 U.S. 164. We therefore find that the consent to search at issue in the instant case was valid and effective.

In proposition of law number ten, appellant challenges the state's use of a purported television schedule to impeach the primary alibi witness, *i.e.,* appellant's girlfriend. At trial, appellant's girlfriend testified both that appellant was home with her on the night of the murder and also that he received the cuts on his fingers that night while

taking out the trash. *Incidental* to this testimony, and as a mere means of indicating the time of night, the witness was asked how she knew that it was 9:30 p.m. Her response was that "we was [*sic*] watching the first show of Children of the Corn." This was reiterated upon cross-examination, at which time the witness also indicated that their television received only one cable movie channel, that being the "Star Channel Movie Channel * * * channel 7."

Later the witness was asked to identify the state's exhibits, which, she indicated, were pages from a TV Guide for January 27 and 28. It was then brought out that the schedule showed no listing for the movie "Children of the Corn" for the night of the murder, January 27. Instead, the movie was scheduled to be shown on the following night and then not on the Movie Channel, but on the HBO channel. Appellant made no objection during the cross-examination, but on redirect the witness stated that the TV schedule was wrong and that the movies were often shown both the day before and the day after the date indicated by the schedule. At the close of the appellant's case, the prosecution moved to admit the TV schedule into evidence. Appellant then objected to its admission apparently on the ground that no proper foundation had been laid to justify such admission. The objection was overruled and the exhibits were admitted.

We note that the use of the exhibits for cross-examination purposes was unobjected to and accordingly waived. See *infra* at proposition of law number four. Moreover, the trial court did not err by admitting the documents at issue. Evid. R. 901(A) provides:

"The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence *sufficient to support* a find-

ing that the matter in question *is what its proponent claims.*" (Emphasis added.)

Evid. R. 902 states:

"Extrinsic evidence of authenticity as a condition precedent to admissibility *is not required* with respect to the following:

"* * *

"(6) *Newspapers and periodicals.* Printed materials purporting to be *newspapers or periodicals,* including notices and advertisements contained therein." (Emphasis added in part.)

In the present case, the proponent of the evidence offered it as a television schedule. Appellant's own witness identified it as such, which would appear to be sufficient testimony that the document was a television schedule. Moreover, the document was also a newspaper or printed periodical publication which, *upon its face,* purported to be a schedule of television broadcasts for the dates specified thereupon. Accordingly, there was no error in admitting these documents. Appellant correctly indicates that nothing upon the face of these documents demonstrates that the material contained therein was correct as to the movies actually broadcast. This, however, is not a precondition to admission of such exhibits since the possibility of intentional alteration of the material is considered quite remote and the possibility of printing error somewhat unlikely. Instead, appellant had complete freedom and opportunity to impeach the document as unreliable. He could have done so by producing a contrasting schedule. Additionally, the matter could easily have been verified by a simple telephone call by appellant to the local cable company. When a document, upon its face, purports to be a particular type of newspaper or periodical publication, its admission into evidence pursuant to Evid. R. 902(6) is

not dependent upon whether the material contained in the publication has been verified. If claimed to be unreliable, the document may be impeached after its admission.

In appellant's eleventh proposition of law, he complains that the prosecutor went well beyond the Rules of Evidence during his cross-examination of appellant such that prejudicial error occurred which, even though unobjected to, should have been corrected by the trial court *sua sponte*. The particular inquiries at issue were into various particulars of appellant's prior criminal record, *i.e.*, that he was a parole violator, that he had used a .38 caliber pistol during a prior armed robbery, particular details of a plea bargain which occurred prior to a previous conviction, and details of the time which appellant spent in prison.

A review of the record indicates that, within the context of this trial, such matters were properly inquired into on cross-examination. Quite early in appellant's direct examination, the following colloquy occurred:

"Q. In the past 10 years, Mr. Greer, have you been convicted of any felony offenses?

"A. Yes, I have.

"Q. Could you tell the ladies and gentlemen of the jury what offenses of a felony you have been convicted of in the last 10 years?

"A. Well, [in] 1974 I was convicted of armed robbery. I was sentenced [to] 10 years in the Tennessee State Penitentiary. I served six years and got out in '81, and in '82 I was convicted of breaking and entering and was out on bond, caught a petty theft, and they brought it up to theft previous. I received one to five on the breaking and entering, I received months in the county workhouse on the theft previous.

"Q. With respect to the armed robbery that occurred within the past 10 years, did you plead guilty to that offense?

"A. Yes, I did.

"Q. With respect to the breaking and entering, did you plead guilty to that offense?

"A. Yes, I did.

"Q. With respect to the petty theft that was elevated, did you plead guilty to that offense?

"A. Yes.

"Q. Is this the first time you have been called upon to testify in a court of law?

"A. Yes, it is.

"Q. When was it you were sentenced and imprisoned, Mr. Greer?

"A. On the robbery or the B and E?

"Q. The robbery charge.

"A. In '74.

"Q. When were you released?

"A. In the last of '80.

"Q. After you were released, where did you live?

"A. I stayed in Lexington for 90 days and moved here."

Immediately apparent was appellant's emphasis upon the fact that he had pled guilty to the prior offenses. This emphasis seems to have been intended to imply that had appellant committed the crimes at issue herein, he would have *pled* guilty. The prosecution's response on cross-examination was to demonstrate that the guilty pleas were the result of plea bargains for lesser sentences and not the result of appellant's overriding compulsion to be truthful. Also, the inquiries into actual time spent in prison, as well as sentences received, were incidental to demonstrating that appellant received lesser sentences than he might have received absent plea bargaining. Further, appellant himself spelled out the particulars of his prior convictions including lengths of sentences received

as well as reduction in time served. Having so opened this door of inquiry, appellant can hardly complain about the prosecution's use of similar information to rebut his attempts to bolster his credibility before the jury prior to questioning about the crime at issue.

On direct examination, appellant was portrayed as a mere thief and not a murderer, *i.e.,* "I steal but I wouldn't do *nothing like that.*" (Emphasis added.) Also, on redirect, appellant testified as follows:

"Q. Mr. Greer, are you a thief?
"A. Yes.
"Q. Mr. Greer, are you a killer?
"A. No."

In both instances, the prosecution responded by demonstrating that appellant was not merely a thief but that he had utilized a deadly weapon in the past to commit armed robbery. Particularly, the state demonstrated that appellant carried a .38 caliber pistol into a business in order to rob it. The prosecutor emphasized that he was an armed robber and not a simple thief. This was an appropriate impeachment by specific acts which directly contradicted appellant's self-characterization. Evid. R. 404(B).

The state also brought out on cross-examination that appellant had been released on parole after serving part of a sentence for armed robbery but that he had violated the terms of his parole and thereafter served the remainder of his sentence. Appellant argues that such inquiry went well beyond Evid. R. 609's[1] allowance of impeachment by prior conviction.

In considering appellant's claim of prejudicial error, we note that appellant had denied any involvement in the slaying of Roth. Further, he denied making various inculpatory statements to the investigating police officers. Obviously, this made appellant's credibility a central issue.

Evid. R. 608(B) provides, in pertinent part:

"Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, * * * may, * * * in the discretion of the court, if clearly probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness * * *."

The issue narrows to whether a parole violation is probative evidence of the witness' character for truthfulness or untruthfulness.

Parole generally involves the release of a prisoner from confinement in a state penal or reformatory institution with supervision then vested in the Department of Rehabilitation and Correction. See R.C. 2967.01(E). As the term "parole" implies, the one released upon parole must, as a condition precedent to his release, *promise* to observe certain terms and conditions. As such, a violation of parole constitutes a specific instance of failure to keep his word. Such failure is almost always "probative of truthfulness or untruthfulness" and is therefore an appropriate subject for impeachment-oriented cross-examination.

In the ninth proposition of law, ap-

---

[1] Evid. R. 609(A) provides:

"For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, or (2) involved dishonesty or false statement, regardless of the punishment whether based upon state or federal statute or ordinance."

pellant asserts that testimony of the victim's statements, made just prior to his demise, should not have been excluded as hearsay evidence. At trial, appellant sought to elicit from the witness the following statement proffered into evidence as allegedly made by the decedent:

"*Rick is back in town.* Lock your doors tonight, and if Rick comes over I'm going to have to kill him." (Emphasis added.) Appellant then explained that the statements when elicited would show that the victim "was afraid of someone other than * * * [appellant]."

Appellant argues that Evid. R. 803(3)[2] provides an exception to the hearsay nature of this statement. Evid. R. 803(3) has no application to the statements at issue insofar as they are asserted to be statements of decedent's state of mind. The decedent simply does not state that he was afraid of anyone. Insofar as there may be derivative inferences favorable to appellant, it must be admitted that they would require the jury to speculate and not merely infer. Since appellant did not present his defense upon the basis that Rick McMillan killed the decedent, it cannot be contended that the statements were anything other than irrelevant, possessing a potential to mislead the jury.

## II

In his fourth proposition of law, appellant requests this court not to apply the doctrine of waiver in capital cases, noting that the court has done so in the past. Appellant premises his request upon the fact that we are here considering imposition of capital punishment and ought to set aside technical rules of procedure "for the sake of justice." Admittedly, the punishment imposed is the most severe which society is capable of inflicting. However, the crime for which it is imposed is undeniably the ultimate of all violent crimes. As a public policy, the punishment for the crime has been legislatively determined, as were the punishments for the commission of lesser crimes. The mere fact that punishments differ provides no basis to assert that procedural rules should differ in their application to the crime charged. We hold that capital defendants are not entitled to special treatment regarding evidentiary or procedural rules. See, *e.g., State* v. *Jester* (1987), 32 Ohio St. 3d 147, 150, 512 N.E. 2d 962, 966-967, and cases cited therein; *State* v. *Jenkins* (1984), 15 Ohio St. 3d 164, 226, 15 OBR 311, 364, 473 N.E. 2d 264, 316, certiorari denied (1985), 472 U.S. 1032. We will utilize the doctrine of waiver where applicable; yet we must also retain power to *sua sponte* consider particular errors under exceptional circumstances. See, *e.g., State* v. *Rogers* (1987), 32 Ohio St. 3d 70, 512 N.E. 2d 581; *State* v. *Zuern* (1987), 32 Ohio St. 3d 56, 512 N.E. 2d 585. This we shall continue to do under our plain error standard of analysis.

Appellant's eighth proposition of law asserts that he was denied the right to the lawful number of peremptory challenges and that such denial is reversible error without any demon-

---

[2] Evid. R. 803(3) provides:

"Then existing, mental, emotional, or physical condition. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will."

stration of prejudice. Prior to trial, appellant asserted a right to twenty-four peremptory challenges, evidently based upon R.C. 2945.21(A)(2) which provides: *"Notwithstanding Criminal Rule 24,* in capital cases in which there is only one defendant, each party * * * may peremptorily challenge *twelve* of the jurors." (Emphasis added.) Apparently, appellant felt entitled to twelve challenges for each charge of murder set forth in the indictment.

The trial court limited appellant to only six peremptory challenges, basing its decision upon Crim. R. 24(C), which states: "In addition to challenges provided in subdivision (B), if there is one defendant, each party peremptorily may challenge three jurors in misdemeanor cases, four jurors in felony cases other than capital cases, and *six jurors in capital cases.*" (Emphasis added.) However, the trial court did offer to grant appellant twelve peremptory challenges if appellant would amend his request. This appellant refused to do. Under any view, appellant was never entitled to more than twelve peremptory challenges in this trial. Since the trial court had offered to grant all twelve, no actual error occurred. Moreover, appellant utilized only five of the six peremptory challenges granted, and is therefore unable to demonstrate actual prejudice.

While the foregoing would ordinarily end our inquiry into the matter, we nevertheless *sua sponte* consider the legal issue created by the conflict between Crim. R. 24(C) and R.C. 2945.21 (A)(2) so as to avoid confusion in the trial courts of Ohio. The law applicable to resolution of this conflict is set forth within Section 5(B), Article IV of the Ohio Constitution. It states as follows:

"The supreme court shall prescribe *rules* governing practice and procedure in all courts of the state, *which rules shall not abridge, enlarge, or modify any substantive right.* * * * All laws in conflict with such rules shall be of no further force or effect after such rules have taken effect." (Emphasis added.)

It is evident upon the face of the Constitution that the Rules of Criminal Procedure as propounded by this court prevail over conflicting state statutes so long as the subject of regulation is procedural. There is, of course, no federal or state constitutional requirement that peremptory challenges be provided within a trial. *Stilson* v. *United States* (1919), 250 U.S. 583. However, such right, once provided by a state's legislature, is a valuable statutory incident to the right of trial by jury. *State* v. *Jackson* (1964), 43 N.J. 148, 203 A. 2d 1, 11 A.L.R. 3d 841, certiorari denied (1965), 379 U.S. 982. When utilized in conjunction with the challenge for cause, the peremptory challenge aids in the provision of an impartial jury. *Stilson, supra; Swain* v. *Alabama* (1965), 380 U.S. 202. Thus, once provided by the General Assembly, the peremptory challenge has become a crucial substantive right. See, *e.g., Swain* v. *Alabama, supra,* at 219; *State* v. *Anderson* (1972), 30 Ohio St. 2d 66, 71-72, 59 O.O. 2d 85, 88-89, 282 N.E. 2d 568, 571. The same cannot be stated with regard to the *number* of peremptory challenges allowed.

While we recognize that rules of procedure may have an occasional substantive effect, it is yet generally true that laws which relate to procedures are ordinarily non-substantive in nature. These would include *rules* of practice, *courses* of procedure and *methods* of review, but not the rights themselves. The present case presents a classic example of an underlying substantive right, the right to peremptorily challenge jurors during voir dire, which application is regulated by a

Rule of Criminal Procedure which sets forth the time and manner as well as the number of times such right may be exercised. The number of allowable peremptory challenges has, with near unanimity, been declared a matter of procedure, "subject to * * * discretion * * * and var[ying] from jurisdiction to jurisdiction." Annotation, Validity and Construction of Statute or Court Rule Prescribing Number of Peremptory Challenges in Criminal Cases according to Nature of Offense or Extent of Punishment (1981), 8 A.L.R. 4th 149, 154; see, also, *Lore* v. *State* (1842), 4 Ala. 173; *O'Neal* v. *State* (1938), 195 Ark. 357, 112 S.W. 2d 615; *Mathis* v. *State* (1893), 31 Fla. 291, 12 So. 681; *Harris* v. *United States* (1910), 4 Okla. Crim. 317, 111 P. 982, all of which cases are discussed in the above annotation and which conclude that the allowable number of peremptory challenges is a matter of procedure.

Nor do the numerical limitations imposed by Crim. R. 24(C) impact substantively upon the right to peremptorily challenge jurors, for the rule is not so restrictive as to constitute a *de facto* abrogation or modification of the right itself. Instead, the rule reasonably limits the number of times when the right may be exercised. This is a matter of judicial economy and within the purview of the Rules of Criminal Procedure. Accordingly, Crim. R. 24(C) is a rule "governing practice and procedure" under Section 5(B), Article IV of the Ohio Constitution. R.C. 2945.21 (A)(2) is a law "in conflict with such rule" and is therefore "of no further force or effect." Section 5(B), Article IV of the Ohio Constitution. Therefore, we hold that appellant received the total number of peremptory challenges to which he was entitled under the applicable law set forth in Crim. R. 24(C).

Appellant asserts in proposition of law number thirteen that the jury should have been instructed upon the lesser included offense of simple theft. This would have permitted the jury to avoid a finding of aggravated robbery, thus vitiating the death penalty specification. Appellant did not request such an instruction during the course of the trial. Accordingly, the assignment of error is waived. Crim. R. 30.

Appellant essentially asserts that the failure by the trial court to give such an instruction *sua sponte* was plain error, affecting a substantial right within the ambit of Crim. R. 52(B). Admittedly, an instruction upon the lesser included offense would have been proper since appellant presented evidence that he had merely entered the property after the victim's murder and had stolen only a watch and cigarettes. However, as pointed out by the state, plain error will not lie for a jury instruction "* * * unless, but for the error, the outcome of the trial clearly would have been otherwise. * * * Notice of plain error under Crim. R. 52(B) is to be taken with the utmost of caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State* v. *Long* (1978), 53 Ohio St. 2d 91, 7 O.O. 3d 178, 372 N.E. 2d 804, paragraphs two and three of the syllabus.

In the instant case, it is clear that the outcome of the trial would not have been affected by inclusion of the instruction contended for. The crucial distinction between the two charges is that, under the aggravated charge, it must be proven that appellant committed the robbery while having a deadly weapon on his person or under his control. Had the jury believed that appellant merely stole various items, they would not have convicted him on the murder charges. Since they convicted him of the murder charges, it is irrefutable that the jury concluded that

appellant utilized a deadly weapon. The further assertion by appellant that, assuming he killed Roth, he had discarded the knife prior to the acts of stealing, is a useless venture in logic. Assuming this scenario, which has a certain ring of truth, it cannot be denied that appellant still had access to the knife and also had already utilized the knife in order to commit theft of Roth's money and valuables. Thus, the crime is not divisible merely because the appellant laid down the deadly weapon after the murder so as to have both hands free to steal. No plain error occurred here.

In his sixteenth proposition of law, appellant argues that introduction of a number of slides and photographs during the state's case in chief created prejudice by arousing juror passions due to the gruesomeness of the pictures, citing *State* v. *Thompson* (1987), 33 Ohio St. 3d 1, 9, 514 N.E. 2d 407, 415-416. This issue was neither raised nor briefed in the court of appeals. It is thus waived and barred from consideration under principles of *res judicata.*

In his propositions of law numbers two and three, appellant attacks the use of the aggravated robbery charge to elevate the murder charge to one of aggravated murder with death penalty specification. Specifically, appellant urges that prosecutorial discretion allows the state to decide for which aggravated felony murder it shall seek the death penalty. This argument was considered and rejected by this court in *State* v. *Jenkins, supra,* citing *Gregg* v. *Georgia* (1976), 428 U.S. 153, 172. See, also, *State* v. *Williams* (1986), 23 Ohio St. 3d 16, 23 OBR 13, 490 N.E. 2d 906.

Appellant also complains that such aggravating circumstances do not accomplish the narrowing function required by *Gregg, supra,* at 188. It is most obvious that the aggravating factor contained in R.C. 2929.04(A)(7) ex-

cludes those who have committed simple robbery, etc. Also, the elements of felony murder do not include a requirement that one be the principal offender or that it be done with prior calculation and design. Again, the argument was considered and rejected by this court in *Jenkins, supra,* at 177-178, 15 OBR at 322-323, 473 N.E. 2d at 279-280, and *Williams, supra,* at 23, 23 OBR at 20, 490 N.E. 2d at 914. The statutes do sufficiently narrow the class of persons eligible for the death penalty.

Appellant asserts in proposition of law number one that Ohio's statutory provisions governing the imposition of capital punishment are constitutionally deficient. As also admitted by appellant and, of course, pointed out by appellee, this court has previously considered and rejected appellant's contentions on *numerous* occasions. See, *e.g., State* v. *Jenkins, supra; State* v. *Buell* (1986), 22 Ohio St. 3d 124, 22 OBR 203, 489 N.E. 2d 795, certiorari denied (1986), 479 U.S. 871. The present assertion is without additional merit.

In part "E" of the first proposition of law, appellant additionally asserts that he was denied a right to an impartial jury because those jurors who stated their inability to recommend a sentence of capital punishment were excluded for cause at the voir dire stage of the trial. The issue of whether jurors may be disqualified because they hold views at variance with the statutorily imposed duties for jurors has been considered before. They may be so disqualified. See, *e.g., Jenkins, supra,* at paragraph two of the syllabus; *Lockhart* v. *McCree* (1986), 476 U.S. 162.

By proposition of law number seven, appellant asserts that juror Heinbaugh was erroneously excluded for cause even though she did not "* * * unequivocally [state] that under

no circumstances * * * [would she] follow the instructions of the trial judge and consider fairly the imposition of the sentence of death. R.C. 2945.25(C)." See, also, *Witherspoon v. Illinois* (1968), 391 U.S. 510.

A review of the record indicates that the juror had considerable emotional difficulty with the requirement of recommending the death penalty. Moreover, at every juncture of the voir dire, she was unable to state that she could follow the court's instructions on the law. Clearly, therefore, she was excludable under R.C. 2945.25(O) as "unsuitable for any other cause to serve as a juror." This issue has been previously presented and resolved by this court. See, *e.g., State v. Buell, supra,* citing *Wainwright v. Witt* (1985), 469 U.S. 412; see, also, *State v. Scott* (1986), 26 Ohio St. 3d 92, 96-97, 26 OBR 79, 83, 497 N.E. 2d 55, 59-60; *State v. Steffen* (1987), 31 Ohio St. 3d 111, 120-121, 31 OBR 273, 281, 509 N.E. 2d 383, 392-393, certiorari denied (1988), 485 U.S. ___, 99 L. Ed. 2d 250, 108 S. Ct. 1089.

### III

In his fourteenth proposition of law, appellant asserts that he was entitled to a second voir dire of the jury prior to the sentencing phase, and this for the purported purpose of inquiring into the jury's possible prejudice from the fact that during the guilt phase it was revealed that the killing was interracial. In *Lockhart v. McCree, supra,* the single jury system as used in Ohio courts was upheld. Also, *Turner v. Murray* (1987), 476 U.S. 28, 37, states that the jury in a capital case may be informed of the alleged interracial character of the murder and questioned accordingly during voir dire. Thus, appellant was fully able to inquire during voir dire concerning possible racial bias. We decline to create

an additional complication in this already unduly encumbered area of the law, particularly when appellant had the option of conducting his inquiry at an earlier stage. We thus conclude that, in a case where the death penalty is sought, the defendant is entitled to only one voir dire of the jury, absent provable irregularities which demonstrably prejudice the defendant's case.

Appellant also asserts in proposition of law number fifteen that a victim impact statement was utilized in the trial court's sentencing considerations in violation of the recent pronouncement contained in *Booth* v. *Maryland* (1987), 482 U.S. ___, 96 L. Ed. 2d 440, 107 S. Ct. 2529. This proposition of law was neither briefed nor argued before the court of appeals. It is accordingly waived and our consideration thereof is barred by the doctrine of *res judicata.*

By way of commentary only, we note that the report at issue was prepared. However, at no time was it ever entered into evidence. It was not given to the jury or specifically commented upon in their presence. The opinion of the trial court is completely devoid of any reference to such report. Accordingly, there has been no showing that the prepared victim impact statement played any part in the sentencing deliberations of either judge or jury. *State* v. *Post* (1987), 32 Ohio St. 3d 380, 383, 513 N.E. 2d 754, 758. Thus, the trial court presumably considered only that evidence which was relevant, probative and competent on the issue. *Id.* at 384, 513 N.E. 2d at 759.

In appellant's seventeenth proposition of law, he asserts that statements contained in the presentence investigation report improperly characterized the evidence at trial and effectively negated appellant's self "proclamation" of innocence. Specifically, the

presentence investigation report stated that appellant's "tennis shoe * * * *matched* a bloody footprint taken at the crime scene." (Emphasis added.) It should be initially observed that this report was considered in the sentencing phase, after the jury had already determined that appellant was guilty of the aggravated murder at issue. Appellant, therefore, can hardly be heard to complain that a presentence investigative report, in summarizing the guilt phase, assumes, as a foregone conclusion, that appellant was guilty of the crime charged, his continued assertions of innocence notwithstanding.

Furthermore, the narrative statement of the circumstances of the offense is an ordinary part of a presentence report, Crim. R. 32.2(B), which report and investigation were ordered by appellant alone. Also, it was within his power to decline to order such report, R.C. 2929.03(D)(1). Moreover, appellant was free to call rebuttal witnesses to correct what he felt was an inaccurate statement in the report. He chose not to do so. As to the statement at issue, the testimony of the state's expert was clear that, in terms of those characteristics which could be compared, appellant's tennis shoe *matched* the footprint found beside and under the victim's body. It stretches the bounds of reason to suggest that the jury had not already concluded likewise. This proposition of law is meritless.

Appellant asserts by his eighteenth proposition of law that arguments of the prosecutor and instructions of the trial court, both occurring during the sentencing phase, combined to improperly preclude the jury from considering sympathy for appellant in its sentencing deliberations. Appellant's burden on this issue is quite heavy for several reasons. First, the error complained of was unobjected to at trial and thereby waived. Second, appellant provides us with no demonstration of any evidence which might indicate that the jury was inclined to view appellant sympathetically but for the errors complained of. The applicable presumption must be that of regularity, not of irregularity, absent a showing of truly egregious error.

Turning now to the trial court's instructions,[3] we note that these instructions have been upheld by prior decisions of this court. See, *e.g., Jenkins, supra,* at 191, 15 OBR at 334, 473 N.E. 2d at 290; *Steffen, supra,* at 125, 31 OBR at 285, 509 N.E. 2d at 396. We continue to find the instruction to be a fair statement of the law and thus decline to reexamine its vitality.

As to the prosecutor's remarks,[4] it would appear that such opening state-

---

[3] The trial court's instructions were:

"Now, as to mitigating factors. Mitigating factors are factors that, while they do not justify or excuse the crime, nevertheless in fairness and mercy, may be considered by you as extenuating or reducing the degree of the Defendant's blame or punishment.

"* * *

"You must not be influenced by any consideration of sympathy or prejudice. It is your duty to carefully weigh the evidence, to decide all disputed questions of fact and apply the instructions of the Court to your findings and to render your verdict accordingly. In fulfilling your duty, your efforts must be to arrive at a just verdict.

"Consider all the evidence and make your finding with intelligence and impartiality, without bias, sympathy or prejudice, so that the State of Ohio and the Defendant will feel that their case was fairly and impartially tried."

[4] The prosecutor remarked, in pertinent part:

"What you have to be careful of, ladies and gentlemen, and Judge Spicer will in-

ment, which went without objection, listed the elements of appellant's background and history which would be brought forth and then concluded with the words, "* * * if you feel sorry for him, that isn't mitigation." This line of argument is quite reasonable. In *State v. Maurer* (1984), 15 Ohio St. 3d 239, 245, 15 OBR 379, 384, 473 N.E. 2d 768, 777, similar background and history of the defendant were set forth at the sentencing phase. We concluded that, although such evidence is appropriately introduced at that stage of the proceedings, the value attached to such evidence is subject to interpretation as follows:

"The types of circumstances under which appellant was living, *i.e.*, alcohol problems, loss of job, etc., are the sort that numerous people live under without turning to criminal conduct, much less the serious crime that appellant was convicted of here." *Id.*

Furthermore, as pointed out in the instructions of the trial court, sympathy *alone* is not a mitigating factor. When asserted as the sole basis for deciding an issue, particularly as contended for by appellant, it has the flavor of bias and prejudice. The weighing process must be done impartially, evaluating the evidence offered in mitigation against the proven aggravating circumstances. Considerations of mercy have always been present within the jury system, and when the evidence so moves a jury it is fully capable of exercising such mercy toward a defendant. *State v. Zuern, supra.* This being true, the prosecution need not enter the sentencing stage of

the proceedings at any disadvantage, but may strongly and forcefully argue that such mercy need not be extended, and that the jury should not be roused to a sympathetic reaction. This the prosecution properly did in the instant case.

In appellant's nineteenth proposition of law, he asserts that various statements made during the sentencing phase of the trial constituted reversible error. There are three principal allegations of improper prosecutorial argument. First, appellant takes exception to the prosecutor's remarks made during the opening statement of the sentencing phase. "Mitigating factors is [*sic*] not an excuse or a justification, but it's something they'd like you to consider in the sentencing portion in favor of this Defendant." Since the jury is required to consider mitigating factors, appellant characterizes this argument as prejudicially inaccurate.

In context, this remark cannot be reasonably read as a suggestion that the jury could ignore such mitigating factors as it found. The prosecutor's next statement was: "Your job then is to weigh the aggravating circumstances against any mitigating factors that you find." The closing argument for the prosecution stated that the mitigating factors have "to rise to such a level in your mind that that outweighs the aggravating circumstance of the killing." The prosecutor went through several factors that the defense offered in mitigation and asked the jury rhetorically after each if it was "more important than" what appellant did to his victim. The prosecution concluded:

---

struct you on this, that you do not decide this case based on bias, sympathy, or prejudice. You do not decide this case on that.

"In other words, if you go into the jury room and you feel sorry for Paul Greer because he has an alcohol problem, * * * or

you feel sorry for Paul Greer because he has borderline intelligence, or you feel sorry for Paul Greer because he had so many children in his family, or that he only went to a certain level of education, if you feel sorry for him, that isn't mitigation."

"You have to weigh those factors. If you find that any of those outweigh[s] what he did to the victim, Louis Roth, in this case, then you should recommend life imprisonment with the possibility of parole in 30 years.

"If * * * you don't feel the fact that the kind of life he has lived outweighs in importance what he has caused to the Louis Roth family, if you find that those do not mitigate, then you must return a finding in this case or a recommendation that the Defendant in this case be sentenced to die."

This was an incorrect statement of the law; the aggravating circumstances must outweigh the mitigating factors before the death penalty can be imposed. R.C. 2929.03(D)(2). If aggravation and mitigation are in equipoise, the jury must recommend a sentence of life imprisonment. However, the court correctly instructed the jury on the weighing process: "* * * [Y]ou must determine whether the aggravating circumstances which Paul W. Greer was found guilty of committing are sufficient to outweigh the mitigating factors in this case.

"If all twelve members of the jury find by proof beyond a reasonable doubt that the aggravating circumstances which Paul W. Greer was found guilty of committing outweigh the mitigating factors, then you must return such findings to the Court.

"* * * [I]f you make such finding, then you have no choice and must recommend to the Court that the sentence of death be imposed upon the Defendant, Paul W. Greer.

"* * *

"On the other hand, if * * * you find that the State of Ohio failed to prove beyond a reasonable doubt that the aggravating circumstances * * * outweigh the mitigating factors, then you will return your verdict reflecting your decision.

"In this event, you will then proceed to determine which of two possible life imprisonment sentences to recommend to the Court. * * *"

The verdict forms, which the court read aloud to the jury, also correctly described the weighing process. The prosecutors, in opening and in closing, stated that their burden was to prove that the aggravating circumstances outweighed the mitigating factors. While the closing argument was inaccurate, any prejudice was cured by the court's instructions and the previous statements of the prosecutors. The error should be considered harmless.

Appellant further objects to the above argument because it asks the jury to weigh the mitigating factors against "what * * * [appellant] has caused to the Louis Roth family." The prosecutor also characterized the offense as "the terrible heinous death that he caused to Louis Roth," and reminded the jury again of the loss to Roth's family:

"You would think that the last thing on earth this man would want to do is to cause that kind of pain to someone else but he did so to the family of Louis Roth, to Margaret Warner, to David Roth, to her other brother who will never ever again see Louis Roth because of what he did."

The prosecutor's characterization of the crime was justified by the evidence and therefore proper, but her reminders of the pain the appellant caused to the Roth family were improper. In *Booth* v. *Maryland, supra,* at ____, 96 L. Ed. 2d at 448, 107 S. Ct. at 2533, the Supreme Court held that the use of victim impact statements in capital sentencing "* * * creates a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner."

However, the prosecutor's use of the potential emotional impact of the crime on the family in argument is different from the introduction of a victim impact statement which quotes family members' expressions of grief.

Moreover, appellant failed to object to the statement complained of. Absent objection, the error will not affect the sentence unless it is clear beyond a reasonable doubt that the result would have been otherwise without the error. In the present case, the reference to the suffering of the Roth family, while poignant, was brief. It did not rise to the level of prejudicial impact.

Appellant also objects to several statements by the prosecution that the state did not seek the death penalty "lightly" or "frivolously." Appellant cites *Brooks* v. *Kemp* (C.A. 11, 1985), 762 F. 2d 1383, vacated and remanded on other grounds (1986), 478 U.S. 1016, for the proposition that a prosecutor commits misconduct when he makes such an argument. In *Brooks,* the prosecutor stated that he had held his position for seven and one-half years and had only sought the death penalty less than a dozen times. This argument improperly implied to the jury that the prosecutor's office had already made the careful judgment that this case, above other murder cases, warranted the death penalty. The court compared the argument to arguing in the guilt phase that " 'we only prosecute the guilty.' " *Brooks, supra,* at 1410.

The improper prosecutorial expertise argument in *Brooks* contained an element absent from the argument in the case at bar: the prosecutor in *Brooks* cited his personal experience reminding the jury how long he had been the district attorney and telling them that he had asked for the death penalty less than a dozen times. Other prosecutorial arguments considered improper by the Eleventh Circuit have also included this feature. See, *e.g., Tucker* v. *Kemp* (C.A. 11, 1985), 762 F. 2d 1480, 1484; *Johnson* v. *Wainwright* (C.A. 11, 1985), 778 F. 2d 623, 630; *Harich* v. *Wainwright* (C.A. 11, 1987), 813 F. 2d 1082, 1094-1095. Neither of the prosecutors in the case here asserted that the jury should rely upon their expertise derived from their experience with other cases.

Also, whatever residual error inheres in the making of the statements at issue, it would appear that such error was harmless. In *Brooks,* the court found harmless error in a more serious example of prosecutorial misconduct because the prosecutor had carefully revealed to the jury the underlying facts on which his selection was made, and the jury could then determine for itself the validity of each underlying factor and the degree to which each factor indicated that death was appropriate. *Brooks, supra,* at 1413-1414. Likewise, the prosecutor in this case explained:

"We * * * [seek the death penalty] based on two factors. That is, the offender in this case, his particular characteristics, his prior criminal background, his tendency for violence when he is not incarcerated. This particular offender.

"We also seek it based on the nature and circumstances of the particular crime that you have heard."

She later added:

"As I initially indicated, the State does not lightly seek the death penalty in this case. However, because of the nature of this particular homicide and the nature and the violent history of Paul W. Greer, we must stand before you and ask that nothing like this ever be allowed to happen again."

The prosecutor's statements in the instant case are much less egregious

than those in the case cited as authority by appellant. Moreover, as previously mentioned, the court refused to find prejudicial error in *Brooks*. We could hardly do less than the same when confronted with less prejudicial statements, such as those now before us.

Appellant finally argues that the prosecutor in court should not have told the jury that its recommendation of the death sentence was "just that, a recommendation" not binding on the court. Appellant cites *Caldwell* v. *Mississippi* (1985), 472 U.S. 320.

As appellant recognizes, this court has never read *Caldwell* to forbid giving the jury accurate information about its lawful role in sentencing. See, *e.g., State* v. *Rogers* (1986), 28 Ohio St. 3d 427, 28 OBR 480, 504 N.E. 2d 52, paragraph one of the syllabus; *State* v. *Steffen, supra*. Appellant invites this court to re-examine its decisions in this area. Despite the purported distinctions urged by appellant between the argument of defense counsel in the present case and those in *Rogers* (1986), *supra*, we are contented with our previously expressed holdings and decline the invitation to overrule them.

In his twentieth proposition of law, appellant contends that various circumstances, which he claims were irrelevant to the sentencing considerations, were injected into that phase of the trial and erroneously argued as aggravating circumstances. As will be seen, appellant misconstrues the role of the jury during this phase. At the sentencing phase, the jury is no longer a mere trier of fact as to guilt and innocence. Instead, it performs part of the function of sentencing authority, which is traditionally an evaluation made by the judiciary. It is ludicrous to assert, as does appellant here, that the jury is to be carefully fed only that information which reflects positively upon appellant. As they share in the

trial court's function, the jurors require access to the wide range of information which the function requires. Thus, as pointed out by the court of appeals, the jury is statutorily required to consider (1) the aggravating circumstances proven at trial, (2) the nature and circumstances of the offense, (3) the history, character and background of the defendant, (4) all the mitigating factors listed in R.C. 2929.04(B) including "any other factor," (5) the presentence investigation report requested by defendant, and (6) the mental examination report requested by defendant. Moreover, once lawfully inserted into the sentencing considerations, such information is subject to fair comment by both parties.

In the case before us, appellant complains that the information contained in the presentence report and the psychological evaluation were commented upon by the prosecution. Specifically, the prosecutor pointed to various convictions and pending charges, including two previous convictions involving initial charges of attempted murder, professional evaluations indicating appellant's lack of remorse, failure to carry on normal social relationships without resorting to violence, and affirmative predictions as to future dangerousness. On its face, consideration of such information is crucial to the evaluations necessarily a part of the sentencing process. They comprise "the history, character, and background of the offender" which information may favor or disfavor a particular defendant, but which nevertheless *"shall" be considered* by the court and the trial jury. R.C. 2929.04 (B).

Furthermore, it was appellant who requested these reports which placed this information before the jury. Appellant was aware in ordering such information compiled, much of which

information was obviously known by appellant as it merely listed his personal history and background, that, pursuant to R.C. 2929.03(D)(1), the trial judge was obligated to furnish the reports to the jury. We note in passing that the trial court personally deleted a small portion of the presentence investigation report. We recognize that such reports are, as a rule, prepared by professionals other than attorneys and occasionally contain reference to irrelevant and/or clearly erroneous views. Here, the trial court excised a purported conclusion of the evidence which stated that the victim's throat had been cut. We approve of such deletion and further add that the trial court has discretion to delete purely erroneous matter in such reports when it has the potential to mislead the jury. However, deletions should be made only when clearly necessary, keeping in mind the General Assembly's determination that such reports are to be submitted for the jury's evaluation. R.C. 2929.03(D)(1).

Also, the prosecutor's remarks on these reports came as rebuttal to appellant's use of the information contained therein to show mitigating circumstances. When a defendant creates a portrait admittedly to evoke the jury's instincts for mercy, the state may then bring to the jury's attention the remaining information within the reports. So long as such material is not set forth as additional aggravating circumstances, it may be argued as part of a defendant's history or as part of the circumstances of the crime which the jury shall consider in its evaluations.

In his twenty-first proposition of law, appellant contends that neither the trial court nor the court of appeals properly weighed the aggravating circumstances against the mitigating factors. Appellant argues that both the sentencing opinion and the appellate opinion weighed his criminal record, lack of remorse, and future dangerousness against him as non-statutory aggravating circumstances. Moreover, appellant asserts that the trial court failed to consider his claim of innocence as a mitigating factor in its analysis.

We have reviewed the record in this matter and find that these assertions are not well-founded. Although the trial court commented upon appellant's anti-social behavior, etc., it clearly relied upon a number of statutorily admissible considerations and reviewed the whole record of the case. It specifically sought evidence of mitigation and having found little, concluded that the aggravating circumstances outweighed what little was shown in mitigation. More specifically, and in reference to appellant's "proclamation" of innocence, the trial court mentioned that appellant did testify in his own behalf but the court concluded that appellant's credibility was "markedly impaired." Furthermore, the court of appeals expressly considered the above factors and properly weighed them.

Having concluded the analysis of those issues raised upon appeal, we now consider, under authority of R.C. 2929.05, whether the aggravating circumstance proven at trial outweighed the evidence offered in mitigation by appellant. The jury concluded that appellant killed Roth, inflicting twenty-two wounds, "while the offender was committing, * * * or fleeing immediately after committing * * * aggravated robbery * * * and either the offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design." R.C. 2929.04(A)(7). The evidence was

quite clear that appellant was the sole principal offender. Further, the evidence indicated that appellant took the victim's watch and cigarettes. The state also adduced evidence that the victim had been given a payroll check for $282.01 on Friday, January 25, 1985, which he cashed on Saturday, January 26, 1985; that on Sunday afternoon, he was observed to be carrying a large quantity of cash which he had folded and kept in his right front trouser pocket; and that when the body was found, the money was missing and the victim's right front trouser pocket had been turned inside out. From such evidence the jury could have easily concluded that appellant took money and valuables belonging to the victim. That the victim was killed by means of stabbing him to death indicates quite clearly that appellant was armed with a deadly weapon at the time of the offense. Consequently, the jury properly found the existence of the above specification to aggravated murder.

In the sentencing phase of the trial, appellant was permitted to introduce evidence as to any or all the following: "* * * [T]he nature and circumstances of the offense, the history, character, and background of the offender, and all of the following factors:

"(1) Whether the victim of the offense induced or facilitated it;

"(2) Whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation;

"(3) Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law;

"(4) The youth of the offender;

"(5) The offender's lack of a significant history of prior criminal convictions and delinquency adjudications;

"(6) If the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim;

"(7) Any other factors that are relevant to the issue of whether the offender should be sentenced to death." R.C. 2929.04(B).

Factors introduced by appellant for mitigation purposes were that appellant was raised in an environment of poverty, his parents died when he was quite young, his father was killed in front of him, he has a relatively low I.Q. and is uneducated, he has a history of alcoholism and unemployment, his conviction was based on circumstantial evidence, and appellant testified that he is innocent. Obviously, such evidence is relevant under factor number seven and is also part of the history, character and background of the offender. Thus, none of the first six mitigating factors has any relevance. We find such evidence completely overshadowed by the demonstrated aggravating circumstance. Moreover, we note that nothing in appellant's history or background indicates that the sentences are other than appropriate.

We further refuse to be guided in our evaluations by the suggested standard, i.e., "only where reasonable minds must always find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors, etc." The instant evaluation is entirely committed to the members of this court, to be done as an independent reweighing. R.C. 2929.05. Thus, the standard is whether this court finds beyond a reasonable doubt that the aggravating circumstances out-

weigh the mitigating factors. This we have so found.

Finally, we must consider whether the sentence imposed was excessive or disproportionate to the penalty imposed in similar cases. R.C. 2929.05 (A). Having reviewed the sentences imposed in *Jenkins, supra, Maurer, supra, Williams, supra,* and *State* v. *Stumpf* (1987), 32 Ohio St. 3d 95, 512 N.E. 2d 598, we conclude that the sentence herein is neither excessive nor disproportionate but is appropriate.

In conclusion, we affirm the appellant's convictions and sentence of death.

The judgment of the court of appeals is hereby affirmed.

*Judgment affirmed.*

MOYER, C.J., SWEENEY and LOCHER, JJ., concur.

WRIGHT and H. BROWN, JJ., concur in paragraphs one, two and three of the syllabus and in the judgment.

DOUGLAS, J., concurs in judgment only.